IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RAAM GLOBAL ENERGY COMPANY, | § | CASE NO. 15-35615 |
| *et al.* | § | |
| | § | (Chapter 11) |
| | § | (Joint Administration Requested) |
| DEBTORS. | § | (Emergency Hearing Requested) |

**EMERGENCY MOTION FOR APPROVAL OF INTERIM AND FINAL USE OF
CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),[1] file this *Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Granting Adequate Protection* (the "Motion"), and in support thereof respectfully state as follows:

**CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(c)[2]**

1.     By this Motion, the Debtors seek: (a) interim authority pursuant to Bankruptcy Code §§ 105, 361, 361, 363, and 507 to use Cash Collateral and all other Prepetition Collateral in accordance with the terms and conditions set forth herein and in accordance with the Budget and the Interim Order, copies of which are attached hereto as **Exhibits A** and **B**, respectively; (b) authority to use Cash Collateral on a final basis in accordance with the Final Budget and the Final Order; (c) to grant adequate protection pursuant to Bankruptcy Code §§ 361 and 363(c) to (i) the First Lien Agent under the First Lien Credit Agreement and the other First Lien Secured Parties, and (ii) the Second Lien Trustee, the Prepetition Agents under the Second Lien Indenture, and the other Second Lien Secured Parties; (d) subject to entry of the Final Order, authorization to grant adequate protection liens on the proceeds and property recovered in respect of the Avoidance Actions; (e) modification of the automatic stay imposed by Bankruptcy Code § 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order; (f) subject to entry of the Final Order, except to the extent of the Carve Out and the Sale Carve Out, the waiver of all rights to surcharge any Prepetition Collateral or Collateral under Bankruptcy Code §§ 506(c) or 552(b) or any other applicable principle of equity of law; (g) that this Court hold the Interim Hearing to consider the relief sought herein and

---

[1] The Debtors are RAAM Global Energy Company [2973], Century Exploration New Orleans, LLC [4948], Century Exploration Houston, LLC [9624], and Century Exploration Resources, LLC [7252].

[2] Capitalized terms not otherwise defined in this Concise Statement have the meanings set forth elsewhere in this Motion or in the Interim Order.

**EMERGENCY MOTION FOR APPROVAL OF INTERIM AND FINAL USE**
**OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION**                          **Page 2 of 23**

entry of the Interim Order; (h) that this Court schedule the Final Hearing to consider the entry of the Final Order; and (i) waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

2.    The following is a summary of the material terms of the Interim Order:[3]

| | |
|---|---|
| **INTEREST HOLDERS**<br><br>*Fed R. Bankr. P. 4001(b)(1)(B)(i)* | First Lien Agent<br>First Lien Secured Parties<br>Second Lien Trustee<br>Second Lien Secured Parties |
| **PURPOSE FOR USE**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii)* | The Debtors have an immediate need to use Cash Collateral to, among other things, permit the orderly continuation of their obligations and preserve the going concern value of their business.  Without access to Cash Collateral, the Debtors' estates will suffer immediate and irreparable harm. |
| **MATERIAL TERMS OF USE**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii)* | **Authorization to Use Cash Collateral**<br><br>The Debtors will be authorized to use Cash Collateral and the Debtors' Cash from the Petition Date through and including the Termination Date, subject in each case to any Permitted Deviation and Non-Conforming Use authorized by the Interim Order, for disbursements set forth in the Budget.<br><br>**Carve Outs**<br><br>The Prepetition Secured Parties consent to a carve out from their Claims (as defined in section 101(5) of the Bankruptcy Code) and the Collateral solely for payment of the fees and for (i) all fees required to be paid to the Clerk of the Court and to the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; plus (ii) fees and expenses up to $25,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code; plus (iii) all allowed unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (any such persons or firms, collectively, the "Debtor Professionals") and the Committee (any such persons or firms, together with the Debtor Professionals, collectively, the "Professional Persons") at any time before the first business day following delivery by the First Lien Agent (via electronic mail, overnight delivery or hand delivery) of a written notice (the "Carve Out Notice"), which notice may be delivered at any time following the occurrence of the Termination Date or a Termination Event, stating that a |

---

[3] Unless otherwise indicated, capitalized terms used and not defined in the table below have the meanings set forth elsewhere in this Motion or in the Interim Order.  The summaries and descriptions are qualified in their entirety by the Interim Order.  In the event that there is a conflict between this Motion and the Interim Order, the Interim Order control in all respects.

Termination Date has occurred or a Termination Event has occurred; and (iv) the allowed fees and expenses (whether allowed by interim order, procedural order, or otherwise) of Professional Persons in an aggregate amount not to exceed $600,000 (the "<u>Post-Carve Out Notice Cap</u>") incurred after the first business day following delivery by the First Lien Agent of the Carve Out Notice as set forth above.

The Prepetition Secured Parties, consent, subject to the terms and conditions set forth in the Interim Order, to a carve out from their Claims (as defined in section 101(5) of the Bankruptcy Code) and the Collateral for the purpose of facilitating the wind-down and administration of the Debtors' estates (the "<u>Sale Carve-Out</u>"). The Sale Carve-Out may only be funded from proceeds of the Sale in an amount, if any, determined by the First Lien Secured Parties in their sole discretion. Upon funding, the Sale Carve-Out will constitute unencumbered property of the Debtors' estates.

**<u>Surcharge Waiver; Release; Challenge Rights.</u>**

Subject to entry of the Final Order, all rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code will be waived, and such waiver will be binding upon the Debtors and all parties in interest in the Cases.

The Debtors will waive and release any and all Claims against each of the First Lien Secured Parties. The Interim Order contains admissions, stipulations, agreements and releases that will be binding on parties in interest if such parties in interest do not challenge them pursuant to procedures and deadlines set forth in the Interim Order.

**<u>Termination</u>**

The Debtors' right to use the Cash Collateral terminates on the earlier to occur of: (i) the date that is thirty-five (35) days after the Petition Date (unless such period is extended by written consent of the Principal First Lien Lender) if the Final Order has not been entered by this Court on or before such date; (ii) the Expiration Date; (iii) the occurrence of any of the events set forth in clauses (a), (b), (c) (d), (i), (j), (k), (l), (m), (n), (o), (p) and (q) of the Interim Order; and (iv) five (5) business days following the delivery of a Default Notice of the occurrence of any of the events set forth in clauses (e), (f), (g), and (h) of the Interim Order unless such occurrence is cured by the Debtors prior to the expiration of the Default Notice Period with respect to such clause or such occurrence is waived by the Principal First Lien Lender in its sole discretion, *provided* that, during the Default Notice Period, the Debtors will be entitled to continue to use the Cash Collateral in accordance with the Interim Order.

The Termination Events include a Termination Event if the Debtors enter into or seek approval by the Court of any plan, restructuring transaction, or asset sale that is not in form and substance acceptable to the Principal First Lien Lender or if the Debtors fail to comply with certain sale process milestones under Bankruptcy Code § 363.

On and after the Termination Date, the Debtors must immediately cease using Cash Collateral and the First Lien Agent may in accordance with the terms and conditions of the Interim Order, absent further order of the Court, following the applicable Termination Date exercise the rights and remedies available under the Prepetition Loan Documents, the Interim Order or applicable law. In any hearing regarding any exercise of rights or remedies, the only issues that may be raised by any of the

**EMERGENCY MOTION FOR APPROVAL OF INTERIM AND FINAL USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION**
US 3410044v.7

**Page 4 of 23**

Debtors in opposition are (x) whether, in fact, the Termination Date shall have occurred and (y) what is the quantum of the Collateral Diminution, and each of the Debtors waives any right to seek relief to the extent such relief would in any way impair or restrict the rights and remedies of the First Lien Agent and the First Lien Secured parties or, subject to the Intercreditor Agreement, the rights and remedies of the Second Lien Secured parties set forth in the Interim Order or the Second Lien Notes Documents.

**Limitation on Use of Cash Collateral**

No Cash Collateral may be used to: (a) object to, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Prepetition Indebtedness, or the liens or claims granted under the Interim Order or the Prepetition Loan Documents and/or assert any claims, defenses or causes of action against the First Lien Secured Parties or their respective agents, affiliates, representatives, attorneys, or advisors; (b) prevent, hinder, or otherwise delay the First Lien Agent's assertion, enforcement, or realization on the Cash Collateral or the Collateral in accordance with the First Lien Loan Documents and the Interim Order; (c) seek to modify any of the rights granted in the Interim Order or the First Lien Loan Documents without the Majority First Lien Lender's prior written consent; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are both approved by an Order of this Court and in accordance with the Budget. Notwithstanding the foregoing, (i) Cash Collateral may be used for participation in formal or informal discovery not initiated by the Debtors; *provided*, *however* any expenses associated with such discovery will reduce dollar for dollar the Committee Investigation Cap, and (ii) advisors to the Committee (if any) may investigate the claims and liens of the First Lien Secured Parties prior to the Committee Challenge Deadline at an aggregate expense not to exceed $25,000.

| | |
|---|---|
| **ADEQUATE PROTECTION**<br><br>*Fed R. Bankr. P. 4001(b)(1)(B)(iv)* | **Adequate Protection for the First Lien Secured Parties**<br><br>Effective as of the Petition Date, as adequate protection for and to secure payment of an amount equal to the Collateral Diminution,[4] the First Lien Secured Parties may be granted and/or entitled to (i) First Lien Adequate Protection Liens, (ii) First Lien Adequate Protection Claims, which administrative claim may have recourse to and be payable from all prepetition and postpetition property of the Debtors excluding the Carve Out, the Sale Carve Out, and the Carve Out Reserve but including, without limitation, subject to entry of the Final Order, the proceeds or property recovered in respect of any Avoidance Actions, (iii) adequate protection payments in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement, and (iv) cash payments for reasonable professional fees, expenses and disbursements incurred by the First Lien Agent and/or by the First Lien Lenders under the First Lien Credit Agreement arising prior and subsequent to the Petition Date. |

---

[4] The term "Collateral Diminution" means an amount equal to the diminution of the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date for the use, sale, lease, consumption, or disposition of Prepetition Collateral, including the use of Cash Collateral, or the imposition of the automatic stay. Cash payments from the proceeds of the Prepetition Collateral made to the First Lien Agent for the benefit of the First Lien Secured Parties do not constitute Collateral Diminution.

The Debtors may not use, sell or lease any assets with a fair market value greater than $50,000 outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without the prior written consent of the Principal First Lien Lender at least five (5) business days prior to the date on which the Debtors seek the authority of this Court for such use, sale or lease.

As additional adequate protection to the First Lien Secured Parties, the Debtors must report and provide to the First Lien Agent and First Lien Lenders, among other things, various reports and other information as the First Lien Agent or the First Lien Lenders may reasonably request.

Unless otherwise agreed to by the Principal First Lien Lender in writing, all sales and other dispositions (including casualty and condemnation events) of assets must be in exchange for 100% cash consideration and are subject to the Principal First Lien Lender's prior written consent.  The Debtors must pay 100% of the net cash proceeds of any such Asset Sale within three (3) business days following receipt thereof to the First Lien Agent, which proceeds will be applied to permanently reduce the First Lien Prepetition Indebtedness.

**<u>Adequate Protection for the Second Lien Secured Parties</u>**

Effective as of the Petition Date, as adequate protection for and to secure payment of an amount equal to the Collateral Diminution, Second Lien Trustee, for the benefit of the Second Lien Secured Parties, will be granted and/or be entitled to (i) Second Lien Adequate Protection Liens and (ii) Second Lien Adequate Protection Claims, which administrative claim will have recourse to and be payable from all prepetition and postpetition property of the Debtors excluding the Carve Out, the Sale Carve Out, and the Carve Out Reserve but including, without limitation, the proceeds or property recovered in respect of any Avoidance Actions, subject to entry of the Final Order.

**<u>Priority of Adequate Protection Liens and Adequate Protection Claims</u>**

Except to the extent of the Carve Out and the Sale Carve Out, the Adequate Protection Liens and Adequate Protection Claims granted to the Prepetition Secured Parties will not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code § 551 and will not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under Bankruptcy Code § 364 or otherwise; *provided that* (a) such Adequate Protection Liens and Adequate Protection Claims will be subject to, and without recourse against, the Carve Out, the Sale Carve Out, and the Carve Out Reserve and (b) the Debtors may not create, incur or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to the Interim Order; (ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business; (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation; and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

3.      The Interim Order contains certain of the provisions (the "Significant Provisions")
listed on Exhibit B to the Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex
Chapter 11 Procedures") as summarized in the attached *Attorney Checklist Concerning Motion
and Order Pertaining to Use of Cash Collateral.*[5] Specifically, the Interim Order (a) binds the
estate or any parties in interest with respect to the validity, perfection, or amount of the secured
creditor's prepetition lien or debt or the waiver of claims against the secured creditor (but subject
to certain challenge rights); (b) subject to entry of a final order, waives the estate's rights under
11 U.S.C. § 506(c); (c) subject to entry of a final order, grants to the prepetition secured creditor
liens on the proceeds of the debtor's claims and causes of action arising under 11 U.S.C. §§ 544,
545, 547, 548, or 549; and (d) grants an administrative adequate protection claims.   The
explanation for the inclusion of the Significant Provisions, as required by Rule 4(C)(vi) of the
Complex Chapter 11 Procedures, is that without such Significant Provisions, the Secured Parties
(as defined below) would not consent to the Debtors' use of Cash Collateral.   Accordingly, the
Significant Provisions in the Interim Order should be approved.

## JURISDICTION AND PROCEDURAL BACKGROUND

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and
157.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5] The term "Significant Provisions" refers to those provisions that: (a) grant cross-collateralization protection (other
than replacement liens or other adequate protection) to the prepetition secured creditors; (b) deem prepetition
secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or
all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b); (c) bind the estate or any
parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt
or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under 11 U.S.C. § 506(c);
(e) grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C.
§§ 544, 545, 547, 548, or 549; (f) impose deadlines for the filing of a plan or a disclosure statement; and (g) grant an
administrative claim.

6.      On October 26, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned cases (the "Cases").

7.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

8.      As of the date hereof, an official committee of unsecured creditors has not yet been appointed in the Cases.

## EMERGENCY CONSIDERATION

9.      The Debtors request emergency consideration of this Motion.  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations.  As discussed in detail below, any delay in granting the interim relief requested could hinder the Debtors' operations and cause irreparable harm.  As such, the Debtors believe that emergency consideration is necessary and request that this Motion be heard at the Debtors' First Day Hearings.

## STATEMENT OF FACTS

**A.      Business Overview**

10.      RAAM Global Energy Company ("RAAM") is an independent oil and natural gas exploration and production company engaged in the exploration, development, production, exploitation, and acquisition of oil and natural gas properties.  The other Debtors are wholly-owned subsidiaries of RAAM, and RAAM provides administrative, technical, financial, and strategic planning support to their subsidiaries.

11.      The Debtors' producing assets are located offshore in the Gulf of Mexico and onshore in Louisiana, Texas, Oklahoma, and California, and the Debtors maintain offices in

Lexington, Kentucky and New Orleans, Louisiana.  The Debtors own an office building in Houston, Texas.  As of September 30, 2015, the Debtors had estimated total proved oil and natural gas reserves of 8,570 MMBoe (26% oil).  For the six months ended June 30, 2015, the Debtors' net daily production averaged 7,116 barrels of oil equivalent per day (BOEPD), which generated revenue of approximately $33.4 million.

12.    The Debtors have traditionally focused on acquiring assets in and around the United States Gulf Coast.  Over the last decade the Debtors have worked to diversify their asset base through the acquisition and development of both conventional onshore assets and long-lived unconventional resource plays that are capable of supporting sustainable growth.  The Debtors' projects during 2014 and the first half of 2015 were focused on three main areas: shallow waters offshore, onshore conventional assets in Texas, and conventional and unconventional assets in California and the Mid-Continent area.  In recent years, the Debtors have invested close to $100 million on large 3-D seismic surveys in the Gulf of Mexico and onshore in Louisiana and Texas in order to enhance their prospect generation capabilities, and the Debtors have invested over $1.5 billion in developing oil and gas assets since their inception.

13.    The Debtors' current drilling program focuses on their core area in Breton Sound located offshore in State of Louisiana waters.  This has historically been a very successful field for the Debtors, and the Debtors recently completed a successful well that is currently in production.  The Debtors presently have an ongoing development portfolio of prospects that it desires to drill.

14.    Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in RAAM's annual, quarterly, and current reports filed with the Securities and Exchange Commission ("SEC") through May 5,

2015, which can be accessed at www.sec.gov and at RAAM's website, http://www.raamglobal.com/.[6]

**B.     Common Stock**

15.     RAAM is a privately held company, and as of September 30, 2015, RAAM had 61,433 outstanding shares of common stock.  Howard Settle, RAAM's Chairman, and former Chief Executive Officer and President, holds approximately 48% of RAAM's outstanding common stock.  As of that date, RAAM's directors and executive officers as a group (eight persons that include Mr. Settle) held approximately 66% of RAAM's common stock.

**C.     Secured Debt**

16.     On September 12, 2014, Century Exploration New Orleans, LLC, Century Exploration Houston, LLC, and Century Exploration Resources, LLC entered into a Fifth Amended and Restated Credit Agreement with Wilmington Trust, National Association, as administrative agent and the lenders party thereto (the "Fifth Amended and Restated Credit Agreement"), and RAAM entered into the Fourth Amended and Restated Guaranty in connection therewith.  The Fifth Amended and Restated Credit Agreement provides the Debtors with an $85.0 million term loan facility (the "Term Loan Facility") that is secured by a first lien on substantially all of the Debtors' real and personal property (with certain exceptions).  As of September 30, 2015, approximately $63.8 million was outstanding under the Term Loan Facility.

17.     On September 24, 2010, RAAM completed an offering of $150.0 million senior secured notes at a coupon rate of 12.5% (the "Original Notes").  On July 15, 2011, RAAM completed the issuance and sale of $50.0 million aggregate principal amount of additional 12.5%

---

[6] On May 5, 2015, RAAM filed Form 15 with the SEC to notify the Commission of its desire to terminate the filing of registration statements and related reports required under the Securities Exchange Act of 1934. Prior to that time, RAAM was a voluntary filer with the SEC.

Senior Notes (the "<u>Additional Notes</u>").  The Additional Notes have identical terms, other than the issue date and issue price, and constitute part of the same series as the Original Notes.

18.     On April 11, 2013, RAAM successfully completed the issuance and sale of $50.0 million aggregate principal amount of additional 12.5% senior secured notes due 2015 (the "<u>New Additional Notes</u>," and together with the Original and Additional Notes, the "<u>Notes</u>").  The New Additional Notes are additional notes issued pursuant to the indenture dated as of September 24, 2010 (the "<u>Base Indenture</u>"), pursuant to which RAAM issued the Original and Additional Notes, as supplemented by the First Supplemental Indenture dated as of July 15, 2011 (the "<u>First Supplemental Indenture</u>"), the Second Supplemental Indenture dated as of April 11, 2013 (the "<u>Second Supplemental Indenture</u>"), and the Third Supplemental Indenture dated as of April 11, 2013 (the "<u>Third Supplemental Indenture</u>," and together with the Base Indenture, First Supplemental Indenture and the Second Supplemental Indenture, the "<u>Indenture</u>").  The New Additional Notes have identical terms, other than the issue date and issue price, and constitute part of the same series as the Original and Additional Notes.  As of September 30, 2015, a total of $238.0 million notional amount of the Notes was outstanding.

19.     The Notes are guaranteed on a senior secured basis by Century Exploration New Orleans, LLC, Century Exploration Houston, LLC, and Century Exploration Resources, LLC. The Notes and the guarantees are secured by a security interest in substantially all of the Debtors' assets to the extent they constitute collateral under the Term Loan Facility, subject to certain exceptions.  Pursuant to an Intercreditor Agreement, the lien securing the Notes is subordinated and junior to liens securing the Term Loan Facility.

20.     The Debtors did not make the scheduled interest payment to the holders of the Notes that was due on April 1, 2015 which was a default under the Indenture.  This non-payment

also constituted a default under the Fifth Amended and Restated Credit Agreement.  Total unpaid and accrued interest at July 31, 2015 was $25.4 million.

21.     On April 30, 2015, the Debtors entered into the *Forbearance Agreement to 12.50% Senior Secured Notes Indenture* with holders of approximately 94% of the face value of the Notes and the *Forbearance Agreement and Second Amendment to the Fifth Amended and Restated Credit Agreement* with Wilmington Trust, National Association, as administrative agent, and the lenders under the Term Loan Facility (collectively, and as amended, the "Forbearance Agreements").  The Forbearance Agreements expired on September 14, 2015.

**D.     Other Significant Obligations**

22.     The Debtors have a promissory note dated August 8, 2005 with GE Commercial Finance Business Property Corporation ("GECF") related to the construction of their Houston office building.  On October 1, 2012, EverBank purchased GECF and is now known as Business Property Lending, Inc.  The balance owed to EverBank was $2.3 million at September 30, 2015. The note requires monthly installments of principal and interest in the amount of approximately $27,000 until September 1, 2025.

23.     Century Exploration New Orleans, LLC and the Bureau of Ocean Energy Management ("BOEM") entered into various leasing agreements for specific exploration and production activity.  Century Exploration New Orleans, LLC is required to obtain one or more surety bonds in order to secure Century Exploration New Orleans, LLC's performance under the obligations relating to such leasing agreements.  Ace American Insurance Company ("ACE") agreed to issue certain of such bonds in the estimated aggregate amount of $39,630,000 in favor of BOEM and as required by BOEM under the leasing agreements.  In connection with its issuance of such bonds, ACE and Century Exploration New Orleans, LLC entered into the Funds

Disbursing Agreement dated October 23, 2014, and a related Escrow Agreement with Bank of America as escrow agent (collectively, the "ACE Bonding Agreement"), that requires Century Exploration New Orleans, LLC to provide funds for the escrow as security for ACE.  The ACE Bonding Agreement contemplates the Debtors funding $750,000 per month until March 31, 2017 into an escrow account for the benefit of ACE, and the balance of such escrow account is approximately $9.9 million as of September 30, 2015.  As of the Petition Date, the Debtors believe they are fully in compliance with the applicable regulatory requirements.

24.     In the ordinary course of business, the Debtors utilize an assortment of vendors, including drilling contractors, labor and repair contractors, parts and equipment suppliers, pipeline companies, heavy machinery and equipment lessors, hydrocarbon transporters, laborers, professionals, and employee benefits providers.  As of the Petition Date, unsecured trade and vendor claims aggregate approximately $3.3 million for all of the Debtors, which amount excludes deficiency claims for any secured creditors, if any.

**E.     Events Leading to Chapter 11**

25.     A confluence of factors in 2014 and 2015 led to the Debtors' need to pursue a financial restructuring.

26.     First, there has been a historic decline in the prices of crude oil and natural gas since the summer of 2014.  These declines have adversely affected the Debtors' revenues and cash flows from operations.  The Debtors' realized pricing is primarily driven by market prices for crude oil and natural gas. The Debtors historically engaged in derivative activities that primarily included the use of floors, costless collars, and futures transactions in order to minimize the downside risk from adverse price movements but allow for the realization of upside profits if available.  The Debtors' derivative counterparties were limited to their secured lenders,

which helped to minimize any potential non-performance risk.  On April 20, 2015, the Company liquidated its hedge positions for $10.8 million and used those funds to reduce the outstanding amount owed under the Term Loan Facility.

27.     Second, although the Debtors have actively worked with investment banking advisors to refinance the Notes, due to the current economic environment the Debtors have been unable to raise cash or identify capital resources from other sources such as bank funding, private investment, or the public debt and equity markets.

28.     Third, during September 2013, the Debtors determined that they could not meet the financial certifications required to obtain permits to develop its offshore Ewing Banks 920 (EB 920) Project in the Gulf of Mexico, due in large part to the substantially increased Worst Case Discharge assumptions imposed by BOEM.  As a result, the proved undeveloped reserves associated with the EB 920 Project no longer met the requirements of reasonable certainty to remain booked as proved reserves at the end of the third quarter of 2013 which adversely impacted the Debtors' reserves and impacted the Debtors' ability to refinance the Notes.  This resulted in a write-off of 8.4 million barrels of oil and largely contributed to a ceiling test write-down of $277 million and an after-tax loss of $186 million for the nine months ended September 30, 2013.

29.     Fourth, in May of 2013, the Flipper Field in Texas suffered a catastrophic collapse.  In December 2012, this field was producing 1,960 BOEPD and in May 2013, after all four wells were severely damaged, the Field was producing 166 BOEPD – a loss of 1,794 BOEPD.  Furthermore, the Company was forced to direct much of its technical efforts and drilling capital in 2013 and 2014 to drilling new wells to reestablish production, hold the leases, and maintain the reserves.

30.     The combination of these factors has impaired the Debtors' liquidity and compelled the Debtors to seek a restructuring of their liabilities in order to maximize the value of their assets for the benefit of their creditors and other constituencies.

31.     The Debtors previously sought to restructure their liabilities pursuant to an exchange offer and consent solicitation that was initiated on June 4, 2015 (the "Exchange Offer").  The Exchange Offer contemplated, among other terms, that if holders of all Notes tendered their Notes in the Exchange Offer, such holders of Notes would receive their pro rata share of $50,000,000 in the aggregate principal amount of new notes maturing on June 30, 2019 and an aggregate amount of 1.17 million shares of RAAM's common stock, which would represent 95% of the outstanding shares of RAAM's common stock following the Exchange Offer, subject to dilution pursuant to the exercise of certain warrants.  The closing of the Exchange Offer was conditioned, among other things, on at least 99% of the aggregate principal amount of outstanding Notes having been validly tendered and not validly withdrawn in the Exchange Offer (the "Minimum Tender Condition").

32.     The Exchange Offer terminated on August 20, 2015.  Holders of approximately 94.77% of the principal amount of outstanding Notes tendered their Notes to be exchanged; however, this was insufficient to meet the Minimum Tender Condition.

33.     The combination of the factors noted above and the failure of a sufficient number of holders of Notes to tender their Notes in the Exchange Offer to meet the Minimum Tender Condition compelled the Debtors to negotiate with their creditors regarding Chapter 11 proceedings in order to address liquidity concerns and maximize the value of their assets for the benefit of their creditors and other constituencies.

34.     For the last several months, the Debtors and their investment bankers have undertaken a thorough marketing process seeking third party stalking horse bidders.   The Debtors were at one point close to finalizing a purchase agreement with a stalking horse bidder for a portion of its assets, but the potential agreement fell through due to market conditions. While there remains interest in the Debtors' assets by third parties, the Debtors have been unable to secure an acceptable third party stalking horse bid at this time after a significant marketing process.

35.     The Debtors are presently negotiating a credit bid stalking horse purchase agreement with the holders of approximately 99% of the outstanding debt under the Term Loan Facility, and the Debtors are seeking to present a credit bid stalking horse purchase agreement and bid procedures to the Court before November 6, 2015.   Such credit bid stalking horse purchase agreement and bid procedures will create a defined sale process, and the Debtors hope that interested parties will bid on its assets in such process to maximize the value of their estates.

## **RELIEF REQUESTED**[7]

36.     As set forth in the concise statement above, by this Motion, the Debtors seek: (a) interim authority pursuant to Bankruptcy Code §§ 105, 361, 361, 363, and 507 to use cash collateral, as such term is defined in Bankruptcy Code § 363(a) ("Cash Collateral"), and all other Prepetition Collateral, in accordance with the terms and conditions set forth herein and in accordance with the proposed 13-week cash disbursements and receipts budget (as such budget may be modified from time to time by the Debtors with the prior written consent of the Principal First Lien Lender)  (the "Budget") and interim order (the "Interim Order"), copies of which are attached hereto as **Exhibits A** and **B**, respectively; (b) authority to use Cash Collateral on a final

---

[7] Capitalized terms used but not defined herein shall have the meaning given in the Interim Order.

basis in accordance with a proposed final budget (the "<u>Final Budget</u>")[8] and final order (the "<u>Final Order</u>"); (c) to grant adequate protection pursuant to Bankruptcy Code §§ 361 and 363(c) to (i) Wilmington Trust, National Association, as Administrative Agent (in such capacity, the "<u>First Lien Agent</u>") under the First Lien Credit Agreement, and the other First Lien Secured Parties, and (ii) The Bank of New York Mellon Trust Company, National Association, as Indenture Trustee (in such capacity, the "<u>Second Lien Trustee</u>") and, collectively with the First Lien Agent, the "<u>Prepetition Agents</u>") under the Second Lien Indenture, and the other Second Lien Secured Parties; (d) subject to entry of the Final Order, authorization to grant adequate protection liens on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Bankruptcy Code §§ 544, 545, 547, 548, and 550 or any similar state or federal law (collectively, the "<u>Avoidance Actions</u>"); (e) modification of the automatic stay imposed by Bankruptcy Code § 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order; (f) subject to entry of the Final Order, except to the extent of the Carve Out and the Sale Carve Out, the waiver of all rights to surcharge any Prepetition Collateral or Collateral under Bankruptcy Code §§ 506(c) or 552(b) or any other applicable principle of equity of law; (g) that this Court hold an interim hearing (the "<u>Interim Hearing</u>") to consider the relief sought herein and entry of the proposed Interim Order; (h) that this Court schedule a final hearing (the "<u>Final Hearing</u>") to consider the entry of the Final Order granting the relief requested herein on a final basis; and (i) waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)).

---

[8] The Debtors are continuing to finalize their proposed Final Budget and Final Order. The Debtors will file and serve their proposed Final Budget and Final Order prior to the hearing scheduled by this Court on final use of Cash Collateral.

## BASIS FOR RELIEF REQUESTED

37.     The Debtors have an immediate need for use of Cash Collateral in order to, among other things, preserve and maintain the value of their assets and businesses and maximize the return to all creditors so that they may execute a sale process and receive the highest possible value therein.   Further, an immediate and critical need exists for the Debtors to use Cash Collateral, consistent with the Budget, for working capital purposes, general corporate purposes, and the satisfaction of costs and expenses of administering the Cases.  The Debtors are without sufficient funds, other than Cash Collateral, to operate for fifteen (15) or more days until the Final Hearing can be held.  The Debtors are unable to obtain adequate unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.

38.     The Debtors are actively pursuing a sale process to sell their assets for repaying their indebtedness and maximizing the recovery to all creditors.  Absent the ability to use Cash Collateral, the Debtors will be forced to shut down all of their operations abruptly, which the Debtors believe will negatively impact the value of their assets and eliminate any prospect for a distribution to certain creditors.  Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of their assets pending the Final Hearing, their request complies with Bankruptcy Rules 4001(b)(2) and 6003.  In order to maintain normal operations, the Debtors are requesting an emergency interim hearing on this Motion.

39.     Pursuant to Bankruptcy Code § 363(c)(2), a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Further, Bankruptcy Code § 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee,

the court, with or without a hearing, shall prohibit such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

40.     The Debtors have satisfied the requirements of Bankruptcy Code §§ 363(c)(2) and (e) because the First Lien Agent, at the discretion of a majority of the First Lien Lenders, consents to the Debtors' use of Cash Collateral in accordance with and subject to the terms and conditions provided for herein and in the Interim Order.   Pursuant to the Intercreditor Agreement, as a result of the First Lien Agent's consent to the use of Cash Collateral, the Second Lien Parties are deemed to have consented to use of Cash Collateral.

41.     The Prepetition Secured Parties are also adequately protected.  Bankruptcy Code § 361 sets forth a non-exclusive list of forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.  A determination of adequate protection is decided on a case-by-case basis, involving a consideration of the "nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection."  *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).  The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case.  *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

42.     The Debtors contend that the Prepetition Secured Parties' interest in their Prepetition Collateral will be adequately protected because the Debtors will grant the Prepetition Secured Parties valid and perfected Adequate Protection Liens (as defined in the Interim Order) to secure against Collateral Diminution.  Such Adequate Protection Liens include replacement liens on collateral that was not encumbered on the Petition Date.  The Debtors will also grant the

Prepetition Secured Parties allowed administrative Adequate Protection Claims (as defined in the Interim Order).

43.     The Debtors will also pay as adequate protection (i) the reasonable professional fees, expenses and disbursements incurred by the First Lien Agent and/or the First Lien Lenders under the First Lien Credit Agreement arising prior and subsequent to the Petition Date and (ii) all accrued and unpaid prepetition or post-petition interest, fees and costs due and payable under the First Lien Credit Agreement.  The other terms, agreements, and provisions of the Interim Order (summarized hereinabove) are additional adequate protection of the Prepetition Secured Parties.

44.     Finally, the Debtors will provide the Prepetition Secured Parties with ample reporting information regarding, among other things, prospective asset sales, business plans, updated cash flow forecasts and budgets.  This information will enable the Prepetition Secured Parties to monitor their interests in the Prepetition Collateral and Cash Collateral.  Reporting of financial information is also a sufficient form of adequate protection.  *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.),* 140 B.R. 806, 809 (D. Kan. 1992) (reports required as part of adequate protection); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.),* 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (same).

45.     Accordingly, the requirements of Bankruptcy Code § 363(e) are satisfied, and the Court should authorize the Debtors to use Cash Collateral in accordance with the terms herein and in the Interim Order.

## NOTICE

46.     Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the

Debtors; (c) counsel to the Debtors; (d) counsel to the lenders under the Term Loan Facility; (e) counsel to ACE American Insurance Company; (f) counsel to certain holders of the Notes; (g) counsel to the administrative agent under the Term Loan Facility; (h) counsel to the indenture trustee and collateral agent under the Notes; (i) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (j) those persons who have formally appeared in the Cases and requested service pursuant to Bankruptcy Rule 2002; (k) the Securities and Exchange Commission; (l) the Internal Revenue Service; and (m) all other applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.

## **PRAYER**

47.     The Debtors respectfully request that the Court enter an Order: (a) authorizing their use of Cash Collateral, and all other Prepetition Collateral, in accordance with the terms and conditions set forth herein and in accordance with the proposed Budget and the Interim Order; (b) authorizing the Debtors to use Cash Collateral on a final basis in accordance with the Final Budget and the Final Order; (c) granting adequate protection pursuant to Bankruptcy Code §§ 361 and 363(c) to the First Lien Agent under the First Lien Credit Agreement, and the other First Lien Secured Parties, and (ii) the Second Lien Trustee and the Prepetition Agents under the Second Lien Indenture, and the other Second Lien Secured Parties; (d) subject to entry of the Final Order, authorizing the Debtors to grant adequate protection liens on the proceeds and property recovered in respect of the Avoidance Actions; (e) authorizing the modification of the automatic stay imposed by Bankruptcy Code § 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order; (f) subject to entry of the Final Order, except to the extent of the Carve Out and the Sale Carve Out, waiving all rights to surcharge any Prepetition Collateral or Collateral under Bankruptcy Code §§ 506(c) or 552(b)

or any other applicable principle of equity of law; (g) scheduling the Interim Hearing to consider the relief sought herein and entering the proposed Interim Order; (h) scheduling the Final Hearing to consider the entry of the Final Order granting the relief requested herein on a final basis; and (i) waiving any applicable stay with respect to the effectiveness and enforceability of the Interim Order or the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)). The Debtors also request any and all other relief to which they may be justly entitled.

Dated: October 26, 2015

Respectfully submitted,

**VINSON & ELKINS LLP**


By:  */s/ Bradley R. Foxman*
       Harry A. Perrin, SBT # 1579800
       John E. West, SBT # 21202500
       Reese A. O'Connor, SBT # 24092910
       First City Tower
       1001 Fannin Street, Suite 2500
       Houston, TX 77002-6760
       Tel:  713.758.2222
       Fax:  713.758.2346
       hperrin@velaw.com; jwest@velaw.com
       roconnor@velaw.com

       and

       William L. Wallander, SBT # 20780750
       Bradley R. Foxman, SBT # 24065243
       Trammell Crow Center
       2001 Ross Avenue, Suite 3700
       Dallas, Texas 75201
       Tel:  214.220.7700
       Fax: 214.999.7787
       bwallander@velaw.com; bfoxman@velaw.com

       **PROPOSED ATTORNEYS FOR THE
       DEBTORS**


**<u>CERTIFICATE OF SERVICE</u>**

      I certify that on October 26, 2015, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

          */s/Bradley R. Foxman*
          One of Counsel