**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **RAAM GLOBAL ENERGY COMPANY,** | § | **CASE NO. 15-35615** |
| *et al.* | § | |
| | § | **(Chapter 11)** |
| | § | **(Joint Administration Requested)** |
| **DEBTORS.** | § | **(Emergency Hearing Requested)** |

**DECLARATION OF JAMES R. LATIMER, III**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, **JAMES R. LATIMER, III**, declare the following to be true and accurate under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am over the age of 18 and am otherwise fully competent to make this declaration ("Declaration").  I am the Chief Restructuring Officer of RAAM Global Energy Company Century Exploration New Orleans ("RAAM"), Century Exploration New Orleans, LLC, Century Exploration Houston, LLC, and Century Exploration Resources, LLC and (collectively, as debtors and debtors in possession, the "Debtors").[1]  In such capacity, I am generally familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2.      I submit this Declaration in support of the voluntary petitions for relief filed by the Debtors under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of October 26, 2015 (the "Petition Date") or concurrently herewith (collectively, the "First Day Pleadings").

3.      I have reviewed the First Day Pleadings and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief

---

[1] RAAM is the parent company of Century Exploration New Orleans, LLC [2973], Century Exploration New Orleans, LLC [4948] ("Century New Orleans"), Century Exploration Houston, LLC [9624] ("Century Houston"), and Century Exploration Resources, LLC [7252] ("Century Resources").

requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into chapter 11 and preserve and maintain the value of the Debtors' estate.  I also believe that, absent immediate access to cash collateral and authority to make certain essential pre-plan payments and otherwise continue conducting ordinary course business operations as set forth herein, and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates.

4.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my review of relevant documents, information provided to me or verified by other executives or employees, conversations with other members of the Debtors' management, and my experience, knowledge and information concerning the Debtors' operations, financials, and the oil and gas industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  This financial information is presented on a consolidated basis for the Debtors, except where noted.  If called to testify, I would testify consequently to the facts set forth herein based upon my personal knowledge, my review of relevant documents, my investigation as Chief Restructuring Officer, and my opinion. I am authorized to submit this declaration on behalf of the Debtors.

5.      Part I of this Declaration provides an overview of the Debtors' business operations, their capital structure and financial standing, and the circumstances surrounding the Debtors' commencement of the above-captioned cases (the "Cases").  Part II of this Declaration sets forth the facts relevant to the various First Day Pleadings in the Cases and the Debtors' business judgment in seeking such relief.  Part III of this Declaration concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

## I.      OVERVIEW

### A.      The Debtors' Business Operations

6.      RAAM is an independent oil and natural gas exploration and production company engaged in the exploration, development, production, exploitation, and acquisition of oil and natural gas properties.  The other Debtors are wholly-owned subsidiaries of RAAM, and RAAM provides administrative, technical, financial, and strategic planning support to their subsidiaries.

7.      The Debtors' producing assets are located offshore in the Gulf of Mexico and onshore in Louisiana, Texas, Oklahoma, and California, and the Debtors maintain offices in Lexington, Kentucky, Houston, Texas, and New Orleans, Louisiana.  As of September 30, 2015, the Debtors had estimated total proved oil and natural gas reserves of 8,570 MMBoe (26% oil).  For the six months ended June 30, 2015, the Debtors' net daily production averaged 7,116 barrels of oil equivalent per day (BOEPD), which generated estimated revenue of approximately $33.4 million.

8.      The Debtors have traditionally focused on acquiring assets in and around the United States Gulf Coast.  Over the last decade the Debtors have worked to diversify their asset base through the acquisition and development of both conventional onshore assets and long-lived unconventional resource plays that are capable of supporting sustainable growth.  The Debtors' projects during 2014 and the first half of 2015 were focused on three main areas: shallow waters offshore, onshore conventional assets in Texas, and conventional and unconventional assets in California and the Mid-Continent area.  In recent years, the Debtors have invested close to $100 million on large 3-D seismic surveys in the Gulf of Mexico and onshore in Louisiana and Texas in order to enhance their prospect generation capabilities, and the Debtors have invested over $1.5 billion in developing oil and gas assets since their inception.

9.      The Debtors' current drilling program focuses on their core area in Breton Sound located offshore in State of Louisiana waters.  This has historically been a very successful field for the Debtors, and the Debtors recently completed a successful well that is currently in production.  The Debtors presently have an ongoing development portfolio of prospects that it desires to drill.

10.     Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in RAAM's annual, quarterly, and current reports filed with the Securities and Exchange Commission ("SEC") through May 5, 2015, which can be accessed at www.sec.gov and at RAAM's website, http://www.raamglobal.com/.[2]

## B.      Common Stock

11.     RAAM is a privately held company, and as of September 30, 2015, RAAM had 61,433 outstanding shares of common stock.  Howard Settle, RAAM's Chairman and former Chief Executive Officer and President, holds approximately 48% of RAAM's outstanding common stock.  As of that date, RAAM's directors and executive officers as a group (eight persons that include Mr. Settle) held approximately 66% of RAAM's common stock.

## C.      Secured Debt

12.     On September 12, 2014, Century Exploration New Orleans, LLC, Century Exploration Houston, LLC, and Century Exploration Resources, LLC entered into a Fifth Amended and Restated Credit Agreement with Wilmington Trust, National Association, as administrative agent and the lenders party thereto (the "Fifth Amended and Restated Credit

---

[2] On May 5, 2015, RAAM filed Form 15 with the SEC to notify the Commission of its desire to terminate the filing of registration statements and related reports required under the Securities Exchange Act of 1934. Prior to that time, RAAM was a voluntary filer with the SEC.

**DECLARATION OF JAMES R. LATIMER, III**
**IN SUPPORT OF FIRST DAY PLEADINGS**                                    Page **4** of **57**
US 3849251v.3

Agreement"), and RAAM entered into the Fourth Amended and Restated Guaranty in connection therewith. The Fifth Amended and Restated Credit Agreement provides the Debtors with an $85.0 million term loan facility (the "Term Loan Facility") that is secured by a first lien on substantially all of the Debtors' real and personal property (with certain exceptions). As of September 30, 2015, $63.8 million was outstanding under the Term Loan Facility.

13.    On September 24, 2010, RAAM completed an offering of $150.0 million senior secured notes at a coupon rate of 12.5% (the "Original Notes"). On July 15, 2011, RAAM completed the issuance and sale of $50.0 million aggregate principal amount of additional 12.5% Senior Notes (the "Additional Notes"). The Additional Notes have identical terms, other than the issue date and issue price, and constitute part of the same series as the Original Notes.

14.    On April 11, 2013, RAAM successfully completed the issuance and sale of $50.0 million aggregate principal amount of additional 12.5% senior secured notes due 2015 (the "New Additional Notes," and together with the Original and Additional Notes, the "Notes"). The New Additional Notes are additional notes issued pursuant to the indenture dated as of September 24, 2010 (the "Base Indenture"), pursuant to which RAAM issued the Original and Additional Notes, as supplemented by the First Supplemental Indenture dated as of July 15, 2011 (the "First Supplemental Indenture"), the Second Supplemental Indenture dated as of April 11, 2013 (the "Second Supplemental Indenture"), and the Third Supplemental Indenture dated as of April 11, 2013 (the "Third Supplemental Indenture," and together with the Base Indenture, First Supplemental Indenture and the Second Supplemental Indenture, the "Indenture"). The New Additional Notes have identical terms, other than the issue date and issue price, and constitute part of the same series as the Original and Additional Notes. As of September 30, 2015, a total of $238.0 million notional amount of the Notes was outstanding.

15.     The Notes are guaranteed on a senior secured basis by Century Exploration New Orleans, LLC, Century Exploration Houston, LLC, and Century Exploration Resources, LLC. The Notes and the guarantees are secured by a security interest in substantially all of the Debtors' assets to the extent they constitute collateral under the Term Loan Facility, subject to certain exceptions.  Pursuant to an Intercreditor Agreement, the lien securing the Notes is subordinated and junior to liens securing the Term Loan Facility.

16.     The Debtors did not make the scheduled interest payment to the holders of the Notes that was due on April 1, 2015 which was a default under the Indenture.  This non-payment also constituted a default under the Fifth Amended and Restated Credit Agreement.  Total unpaid and accrued interest at July 31, 2015 was $25.4 million.

17.     On April 30, 2015, the Debtors entered into the Forbearance Agreement to 12.50% Senior Secured Notes Indenture with holders of approximately 94% of the face value of the Notes and the Forbearance Agreement and Second Amendment to the Fifth Amended and Restated Credit Agreement with Wilmington Trust, National Association, as administrative agent, and the lenders under the Term Loan Facility (collectively, and as amended, the "Forbearance Agreements").  The Forbearance Agreements expired on September 14, 2015.

### D.     Other Significant Obligations

18.     The Debtors have a promissory note dated August 8, 2005 with GE Commercial Finance Business Property Corporation ("GECF") related to the construction of their Houston office building.  On October 1, 2012 EverBank purchased GECF and is now known as Business Property Lending, Inc.  The balance owed to EverBank was $2.3 million at September 30, 2015. The note requires monthly installments of principal and interest in the amount of approximately $27,000 until September 1, 2025.

19.     Century Exploration New Orleans, LLC and the Bureau of Ocean Energy Management ("BOEM") entered into various leasing agreements for specific exploration and production activity.  Century Exploration New Orleans, LLC is required to obtain one or more surety bonds in order to secure Century Exploration New Orleans, LLC's performance under the obligations relating to such leasing agreements.  Ace American Insurance Company ("ACE") agreed to issue certain of such bonds in the estimated aggregate amount of $39,630,000 in favor of BOEM and as required by BOEM under the leasing agreements.  In connection with its issuance of such bonds, ACE and Century Exploration New Orleans, LLC entered into the Funds Disbursing Agreement dated October 23, 2014, and a related Escrow Agreement with Bank of America as escrow agent (collectively, the "ACE Bonding Agreement"), that requires Century Exploration New Orleans, LLC to provide funds for the escrow as security for ACE.  The ACE Bonding Agreement contemplates the Debtors funding $750,000 per month until March 31, 2017 into an escrow account for the benefit of ACE, and the balance of such escrow account is approximately $9.9 million as of September 30, 2015.  The Debtors are addressing their plugging and abandonment liability on an ongoing basis and are fully in compliance with the applicable regulatory requirements.

20.     In the ordinary course of business, the Debtors utilize an assortment of vendors, including drilling contractors, labor and repair contractors, parts and equipment suppliers, pipeline companies, heavy machinery and equipment lessors, hydrocarbon transporters, laborers, professionals, and employee benefits providers.  As of the Petition Date, unsecured trade and vendor claims aggregate approximately $3.3 million for all of the Debtors, which amount excludes deficiency claims for any secured creditors, if any.

E.      **Events Leading to Chapter 11**

21.     A confluence of factors in 2014 and 2015 led to the Debtors' need to pursue a financial restructuring.

22.     First, there has been a historic decline in the prices of crude oil and natural gas since the summer of 2014.  These declines have adversely affected the Debtors' revenues and cash flows from operations.  The Debtors' realized pricing is primarily driven by the West Texas Intermediate price for crude oil and the spot market prices for natural gas production. The Debtors historically engaged in derivative activities that primarily included the use of floors, costless collars, and futures transactions in order to minimize the downside risk from adverse price movements but allow for the realization of upside profits if available.   The Debtors' derivative counterparties were limited to their secured lenders, which helped to minimize any potential non-performance risk.  On April 20, 2015, the Company liquidated its hedge positions for $10.8 million and used those funds to reduce the outstanding amount owed under the Term Loan Facility.

23.     Second, although the Debtors have actively worked with investment banking advisors to refinance the Notes, due to the current economic environment the Debtors have been unable to raise cash or identify capital resources from other sources such as bank funding, private investment, or the public debt and equity markets.

24.      Third, during September 2013, the Debtors determined that they could not meet the financial certifications required to obtain permits to develop its offshore Ewing Banks 920 (EB 920) Project in the Gulf of Mexico, due in large part to the substantially increased Worst Case Discharge assumptions imposed by BOEM.  As a result, the proved undeveloped reserves associated with the EB 920 Project no longer met the requirements of reasonable certainty to remain booked as proved reserves at the end of the third quarter of 2013 which adversely

impacted the Debtors' reserves and impacted the Debtors' ability to refinance the Notes. This resulted in a write-off of 8.4 million barrels of oil and largely contributed to a ceiling test write-down of $277 million and an after-tax loss of $186 million for the nine months ended September 30, 2013.

25.     Fourth, in May of 2013, the Flipper Field in Texas suffered a catastrophic collapse. In December 2012, this field was producing 1,960 BOEPD and in May 2013, after all four wells were severely damaged, the Field was producing 166 BOEPD – a loss of 1,794 BOEPD. Furthermore, the Company was forced to direct much of its technical efforts and drilling capital in 2013 and 2014 to drilling new wells to reestablish production, hold the leases, and maintain the reserves.

26.     The combination of these factors has impaired the Debtors' liquidity and compelled the Debtors to seek a restructuring of their liabilities in order to maximize the value of their assets for the benefit of their creditors and other constituencies.

27.     The Debtors previously sought to restructure their liabilities pursuant to an exchange offer and consent solicitation that was initiated on June 4, 2015 (the "Exchange Offer"). The Exchange Offer contemplated, among other terms, that if holders of all Notes tendered their Notes in the Exchange Offer, such holders of Notes would receive their pro rata share of $50,000,000 in the aggregate principal amount of new notes maturing on June 30, 2019 and an aggregate amount of 1.17 million shares of RAAM's common stock, which would represent 95% of the outstanding shares of RAAM's common stock following the Exchange Offer, subject to dilution pursuant to the exercise of certain warrants. The closing of the Exchange Offer was conditioned, among other things, on at least 99% of the aggregate principal

amount of outstanding Notes having been validly tendered and not validly withdrawn in the Exchange Offer (the "Minimum Tender Condition").

28.     The Exchange Offer terminated on August 20, 2015.  Holders of approximately 94.77% of the principal amount of outstanding Notes tendered their Notes to be exchanged; however, this was insufficient to meet the Minimum Tender Condition.

29.     The combination of the factors noted above and the failure of a sufficient number of holders of Notes to tender their Notes in the Exchange Offer to meet the Minimum Tender Condition compelled the Debtors to negotiate with their creditors regarding chapter 11 proceedings in order to address liquidity concerns and maximize the value of their assets for the benefit of their creditors and other constituencies.

30.     For the last several months, the Debtors and their investment bankers have undertaken a thorough marketing process seeking third party stalking horse bidders.  The Debtors were at one point close to finalizing a purchase agreement with a stalking horse bidder for a portion of its assets, but the potential agreement fell through due to market conditions. While there remains interest in the Debtors' assets by third parties, the Debtors have been unable to secure an acceptable third party stalking horse bid at this time after a significant marketing process.

31.     The Debtors are presently negotiating a credit bid stalking horse purchase agreement with the holders of approximately 99% of the outstanding debt under the Term Loan Facility, and the Debtors are seeking to present a credit bid stalking horse purchase agreement and bid procedures to the Court before November 6, 2015.  Such credit bid stalking horse purchase agreement and bid procedures will create a defined sale process, and the Debtors hope that interested parties will bid on its assets in such process to maximize the value of their estates.

## II.      REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY MOTIONS[3]

32.     As set forth above, the Debtors are operating in a cash-intensive industry and are struggling to meet their day-to-day liquidity needs in order to derive the maximum revenue from existing and future production and to ensure that profitable wells will be brought online on a timely basis.  The Debtors intend to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules.  Absent the Court granting the relief requested by the Debtors in their First Day Pleadings on an emergency basis, the Debtors will suffer immediate and irreparable harm.

33.      I have reviewed the First Day Pleadings listed below and the allegations contained in each are true and correct to the best of my knowledge, information, and belief.

### A.      Administrative and Procedural Matters

####     i.      *Debtors' Notice of Designation as Complex Chapter 11 Cases* **(the "Notice of Complex Designation")**

34.     Currently, the Debtors' have total debt of more than $10 million in the aggregate and there are more than 50 parties in interest in the Cases.  I believe that application of the Complex Chapter 11 Procedures to the Cases will assure appropriate notice of the filings in the Cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders.  Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Designation.

####     ii.      *Emergency Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases* **(the "Joint Administration Motion")**

---

[3] Capitalized terms not defined herein have the meanings set forth in the respective First Day Pleadings.

35.     The Debtors are related.  RAAM is the direct parent and sole equity interest owner of Century New Orleans, Century Houston, and Century Resources.  I am aware that many, if not all, of the notices, applications, motions, other pleadings, hearings, and orders in the Cases will relate to relief sought jointly by all of the Debtors.  If each Case were administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the resources of the Debtors' estates, as well as the resources of this Court and of other parties in interest.

36.     Joint administration of the Cases for procedural purposes only, under a single docket entry, will permit the Clerk of the Court to use a single general docket for all of the Cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding the Cases.  Similarly, supervision of the administrative aspects of the Cases by the UST will be simplified.  Accordingly, I believe joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the UST, and the Court.

37.     Further, joint administration of the Cases will not give rise to any conflict of interest among the Debtors' estates, and the rights of the Debtors' respective creditors will not be adversely affected by joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records.  Each creditor will be required to file a proof of claim against the applicable estate in which it allegedly has a claim or right and will retain whatever claims or rights it has against the particular estate.  I believe the recoveries of all creditors will be enhanced by the reduction in costs resulting from

joint administration of the Cases, and the Court will also be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files.

38.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

> **iii.**     ***Emergency Motion For (a) Authority to File a Consolidated List of Creditors; (b) Authority to File a Consolidated List of 50 Largest Unsecured Creditors; (c) Setting of Bar Dates; and (d) Approval of the Form and Manner of Notifying Creditors of the Commencement of the Cases and Other Information*** (the "<u>Notification Motion</u>")

39.     There are thousands of creditors and parties in interest in the Cases.  The size and magnitude of the noticing process to parties in interest makes it impracticable for the Clerk of the Court to undertake that task.  The Debtors maintain lists of the names and addresses of all such entities on various computer programs that permit the Debtors or an outside firm to print mailing labels for each such entity.  I believe that the most effective and efficient manner by which to accomplish the process of photocopying and transmitting notices in the Cases is to authorize BMC Group, Inc., the Debtors' proposed noticing and claims agent (the "<u>Noticing and Claims Agent</u>"), to act as an authorized noticing agent of the Court.  The Debtors will separately file an application to employ the Noticing and Claims Agent to serve this purpose.

40.     Because the preparation of separate lists of creditors for each Debtor would be expensive and time consuming, and because a large number of creditors are shared amongst the Debtors, I believe the Creditors Matrix and the Top 50 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

41.     I believe setting the bar dates for unsecured creditors, equity security holders, and governmental entities in accordance with the preceding sentence is appropriate under the circumstances of the Cases, and will allow the Debtors to operate efficiently in chapter 11.

42.     I believe that service of the single Notice of Commencement will not only avoid confusion among the Debtors' creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous master creditors' matrix.  Accordingly, I believe that service of a single Notice of Commencement is warranted.

43.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notification Motion.

     **iv.**     ***Emergency Motion Seeking Extension of Time to File Schedules of Assets and Liabilities, Current Income and Expenditures, Executory Contracts and Unexpired Leases, and Statements of Financial Affairs*** **(the "<u>Schedules and Statements Motion</u>")**

44.     The Debtors' management and employees, together with the Debtors' outside legal and financial advisors, have begun compiling the information necessary to complete the Schedules and Statements; however, due to the size and complexity of the Debtors' businesses, their limited staffing, and their pre-petition focus on restructuring their financial affairs, the Debtors have not yet had a sufficient opportunity to complete the preparation of the Schedules and Statements.   While the Debtors maintain extensive books and records, completing the Schedules and Statements will require the collection, analysis, and compilation of a significant amount of data.  Meanwhile, the Debtors are experiencing the considerable stresses of preparing for the filing of the Cases, transitioning into chapter 11, negotiating a credit bid stalking horse purchase agreement, and the preexisting, ongoing responsibilities of operating their business.

Accordingly, I do not anticipate the Debtors will be capable of finalizing their Schedules and Statements within the 14-day period prescribed by the Bankruptcy Rules.

45.      Granting the Debtors additional time to collect the data needed to prepare and file the Schedules and Statements will greatly enhance their accuracy, while allowing the Debtors to simultaneously focus their attention on other high priority matters in the early stages of the Cases.  I anticipate that it will take the Debtors' management and employees, with the assistance of their legal and professional advisors, 45 days to complete, review, and file the Schedules and Statements with the Court.

46.      For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Schedules and Statements Motion.

**B.      <u>Substantive Matters</u>**

i.      *Emergency Motion to (i) Approve Maintenance of Certain Pre-Petition Bank Accounts and Cash Management System and (ii) Continue Use of Existing Checks and Business Forms* **(the "<u>Cash Management Motion</u>")**

47.      <u>Cash Management System</u>.  Prior to commencing the Cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "<u>Cash Management System</u>").  The Cash Management System is designed to efficiently collect, transfer, and disburse funds for each of the Debtors.  Deposit account control agreements have been entered into with respect to certain of the Debtors' bank accounts, and certain of the Debtors' bank accounts are pledged to the lenders under the Term Loan Facility and holders of the Notes.

48.      I believe that the Cash Management System is essential to the day-to-day operation of the Debtors' businesses.  Changing their bank accounts and creating a new cash management system from scratch would force the Debtors to incur significant and unnecessary

costs and expenses, completely impair their business operations, cause confusion, disrupt payments, and introduce inefficiency at a time when efficiency is most critical.  The Cash Management System is highly computerized and automated, and the Debtors maintain accounting controls with respect to each of their bank accounts to enable them to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Therefore, all transfers and transactions occurring within the Cash Management System will be properly documented, and accurate records of any permitted Intercompany Transfers and account balances will be maintained.  Accordingly, I believe the maintenance of the Cash Management System will benefit all parties in interest.

49.    <u>Bank Accounts</u>.  Historically, the Debtors have maintained 21 bank accounts at various banks and financial institutions.  The Debtors recently closed the payroll account for Century Resources, and thus, as of the Petition Date the Debtors maintain 20 bank accounts.  A complete list of the Debtors' bank accounts may be found at **<u>Exhibit A</u>** to the Cash Management System, and a flow chart explaining the Cash Management System may be found at **<u>Exhibit B</u>** to the Cash Management Motion.

50.    *The RAAM Bank Accounts*.  RAAM maintains:

(a)    two bank accounts with Capital One Financial Corporation ("<u>Capital One</u>"), (i) Account No. XXXX-X28-220 (the "<u>RAAM Checking Account</u>") and (ii) Account No. XXX-X51-833 (the "<u>RAAM Sweep Account</u>"); and

(b)    one bank account with JPMorgan Chase Bank, N.A. ("<u>Chase</u>"), Account No. XX-XX7-8069 (the "<u>RAAM Payroll Account</u>").

51.     RAAM typically does not generate income, and thus, from time to time it receives funds from Century New Orleans, Century Houston, and Century Resources to cover its expenditures.   The funds received by RAAM are transferred or deposited into the RAAM Checking Account.  Each night, the balance of the RAAM Checking Account is swept into the RAAM Sweep Account; then, each morning, the balance of the RAAM Sweep Account is swept back into the RAAM Checking Account.   The RAAM Sweep Account is an interest earning account.

52.     At the end of each month, sufficient funds from the RAAM Checking Account are transferred to the RAAM Payroll Account to fund RAAM's payroll obligations.  If the RAAM Checking Account does not have sufficient funds to meet RAAM's payroll obligations, the RAAM Payroll Account is funded by the bank accounts of Century New Orleans, Century Houston, and Century Resources.

53.     *The Century New Orleans Bank Accounts*.  Century New Orleans maintains:

(a)     five bank accounts with Capital One, (i) Account No. XXXX-200-32 (the "New Orleans Primary Concentration Account"), (ii) Account No. XXXX-200-40 (the "New Orleans Operations Account"), (iii) Account No. XXXX-200-59 (the "New Orleans Royalty Account"), (iv) Account No. XXX-X16-122 (the "New Orleans Land Account"), and (v) Account No. XXX-X18-496 (the "New Orleans Sweep Account");

(b)     three accounts with Chase, (i) Account No. XX-XX1-2964 (the "New Orleans Secondary Concentration Account"), (ii) Account No. XXX-XX9-3999 (the "New Orleans Money Market Account"), and (iii) Account No. XX-XX4-3973 (the "New Orleans Payroll Account"); and

(c)     one bank account with Bank of America, Account No. XXXX27-539 (the "Escrow Account").

54.    Revenues received by Century New Orleans related to its operations and from Century Houston and Century Resources are transferred or deposited into the New Orleans Primary Concentration Account.   During the day, the New Orleans Primary Concentration Account operates as a holding account for these revenues.

55.    Historically, Century New Orleans has contributed $750,000 into the Escrow Account on a monthly basis, pursuant to the ACE Bonding Agreement.   When payments pursuant to the ACE Bonding Agreement become due, the Debtors are permitted under the ACE Bonding Agreement to request funds from the Escrow Account to fund plugging and abandonment activities.

56.    The New Orleans Operations Account and the New Orleans Royalty Account are zero balance checking accounts used to pay accounts payable and royalty payments in the ordinary course of business as they become due.  The New Orleans Operations Account and New Orleans Royalty Account are funded via a bank transfer from the New Orleans Primary Concentration Account in an amount equal to the amount of checks and wires presented for payment during the day, resulting in zero balances for both such accounts at the end of the day.

57.    Each night, the balance of the New Orleans Primary Concentration Account is swept into the New Orleans Sweep Account; then, each morning, the balance in the New Orleans Sweep Account is swept back into the New Orleans Primary Concentration Account.  The New Orleans Sweep Account is an interest earning account.

58.    The New Orleans Secondary Concentration Account is a checking account used by the Debtors from time to time for miscellaneous transactions.  This account is not swept into the New Orleans Sweep Account.

59.     The New Orleans Money Market Account serves as an interest earning account. This account is not swept into the New Orleans Sweep Account.

60.     The New Orleans Land Account is used for monthly land obligations, including, *inter alia*, delay rentals, options to extend or renew, surface rentals, pipeline rights of way, surface and subsurface agreements, penalties under the terms of the lease (*i.e.*, for failure to drill, retroactive rental, etc.), regulatory fees, and related expenses submitted from various landmen, administrative staff, and technical staff.  The New Orleans Land Account is funded from the New Orleans Concentration Account via a transfer for approved land obligations by request of the Debtors' land department (the "Land Department").  If New Orleans lacks sufficient funds to satisfy land payment obligations, such transfers are made from the bank accounts of Century Houston, Century Resources, or RAAM.  The balance of the New Orleans Land Account is not swept into the New Orleans Sweep Account.

61.     At the end of each month, sufficient funds from the New Orleans Primary Concentration Account are transferred to the New Orleans Payroll Account to fund the payroll obligations of Century New Orleans.  If Century New Orleans lacks sufficient funds to meet its payroll obligations, such transfers are made from the bank accounts of Century Houston, Century Resources, or RAAM.

62.     *The Century Houston Bank Accounts.*  Century Houston maintains:

(a)     four bank accounts with Capital One, (i) Account No. XXXX-X89-077 (the "Houston Concentration & Operations Account"), (ii) Account No. XXXX-X24-326 (the "Houston Royalty Account"), (iii) Account No. XXXX-X89-610 (the "Houston Land Account"), and (iv) Account No. XXX-X44-780 (the "Houston Sweep Account"); and

(b)      one bank account with Chase, Account No. XX-XX7-8077 (the "<u>Houston Payroll Account</u>").

63.      Revenues received by Century Houston related to its operations and from Century New Orleans and Century Resources are transferred or deposited into the Houston Concentration & Operations Account.  The Houston Concentration & Operations Account is a checking account used to pay various accounts payable as they become due.

64.      Each night, the balance of the Houston Concentration & Operations Account is swept into the Houston Sweep Account; then, each morning, the balance in the Houston Sweep Account is swept back into the Houston Concentration & Operations Account.  The Houston Sweep Account is an interest earning account.

65.      The Houston Royalty Account is used to pay royalty obligations as they become due.  The Houston Royalty Account is funded via a bank transfer from the Houston Concentration & Operations Account in an amount equal to the amount of checks and wires presented for payment during the day, resulting in a zero balance for the Houston Royalty Account at the end of the day.  The Houston Royalty Account is not swept into the Houston Sweep Account.

66.      The Houston Land Account is used for monthly land obligations, including, *inter alia*, delay rentals, options to extend or renew, surface rentals, pipeline rights of way, surface and subsurface agreements, penalties under the terms of the lease (*i.e.*, for failure to drill, retroactive rental, etc.), regulatory fees, and related expenses submitted from various landmen, administrative staff, and technical staff.  The Houston Land Account is funded from the Houston Concentration & Operating Account via a bank transfer for approved land obligations by request of the Land Department.  If Century Houston lacks sufficient funds, such transfers are made

from the bank accounts of Century New Orleans, Century Resources, or RAAM. The balance of the Houston Land Account is not swept into the Houston Sweep Account.

67.     At the end of each month, sufficient funds from the Houston Concentration & Operations Account are transferred to the Houston Payroll Account to fund Century Houston's payroll obligations. If Century Houston lacks sufficient funds, such transfers are made from the bank accounts of Century New Orleans, Century Resources, or RAAM.

68.     *The Century Resources Bank Accounts.*[4] Century Resources maintains three bank accounts with Capital One:

(a)     Account No. XXXX-X99-664 (the "Resources Concentration, Operations & Royalty Account");

(b)     Account No. XXXX-X99-656 (the "Resources Land Account"); and

(c)     Account No. XXX-X62-397 (the "Resources Sweep Account").

69.     Revenues received by Century Resources related to its operations and from Century New Orleans and Century Houston are transferred or deposited into the Resources Concentration, Operations & Royalty Account. The Resources Concentration, Operations &

---

[4] The Debtors' books and records further indicate that, as of the Petition Date, there is an escrow account that holds approximately $564,458.41 relating to assets sold pre-petition pursuant to that certain Asset Purchase and Sale Agreement between Century Resources and California Resources Production Company ("CRPC") dated July 23, 2015 (the "CRPC PSA"). Article 2.7 of the CRPC PSA provides for 10% of the closing payment (the "Escrow Fund") to go into an escrow account to cover potential legal costs that CRPC may incur should the transaction be threatened, including, among other things, indemnification of CPRC by Century Resources. Pursuant to Article 7.4(b) of the CRPC PSA, the Escrow Fund will be held in a trust fund until the earlier of: (i) twelve (12) months after the date of the CRPC PSA, (ii) such date as mutually agreed to between Century Resources and CPRC, or (iii) the date on which causes of action to avoid the transaction and transfers under the CRPC PSA by, or for the benefit of, creditors of Century Resources who are existing on the Closing Date (as defined in the CRPC PSA) can no longer be brought as a matter of law (the "Escrow Period"). At the end of the Escrow Period, Century Resources and CPRC will jointly instruct the Escrow Agent (as defined in the CRPC PSA) to release the remainder of the Escrow Fund to Century Resources after deducing from the Escrow Fund any and all attorney's fees and legal costs incurred by CPRC related to defending the disposition of Assets (as defined in the CRPC PSA), the CRPC PSA, or any document executed in connection with the CRPC PSA.

Royalty Account is a checking account used to pay various accounts payable and royalty obligations as they become due.

70.    Each night, the balance of the Resources Concentration, Operations & Royalty Account is swept into the Resources Sweep Account; then, each morning, the balance of the Resources Sweep Account is swept back into the Resources Concentration, Operations & Royalty Account.  The Resources Sweep Account is an interest earning account.

71.    The Resources Land Account is used for monthly land obligations, including, *inter alia*, delay rentals, options to extend or renew, surface rentals, pipeline rights of way, surface and subsurface agreements, penalties under the terms of the lease (*i.e.*, for failure to drill, retroactive rental, etc.), regulatory fees, and related expenses submitted from various landmen, administrative staff, and technical staff.  The Resources Land Account is funded from the Resources Concentration, Operations & Royalty Account via a bank transfer for approved land obligations by request of the Land Department.  If Resources lacks sufficient funds, such transfers are made from the bank accounts of Century New Orleans, Century Houston, or RAAM.  The balance of the Resources Land Account is not swept into the Resources Sweep Account.

72.    *Bank Account Balances*.  The Debtors books and records indicate that, as of the Petition Date, the balances of the Debtors' respective concentration and operations accounts are as follows: (a) approximately $3,261,811.42 in the RAAM Checking Account; (b) approximately $3,161,089.57 in the New Orleans Primary Concentration Account; (c) approximately $3,121,074.54 in the Houston Concentration and Operations Account; and (d) approximately $919,974.87 in the Resources Concentration, Operations & Royalty Account.

73.    *Royalty and Land Payments*.  The Debtors' books and records further indicate, based on the average expenditures for the preceding 12 months, that the Debtors pay: (a) approximately $1,815,000 each month from the New Orleans Royalty Account for royalty obligations[5] and approximately $71,000 each month from the New Orleans Land Account for land obligations; (b) approximately $2,430,000 each month from the Houston Royalty Account for royalty obligations[6] and approximately $79,000 each month from the Houston Land Account for land obligations; and (c) approximately $1,790,000 each month from the Resources Concentration, Operations & Royalty Account for royalty obligations.[7]  The amounts paid by the Debtors in recent months on account of royalty obligations have decreased significantly due to the current market conditions.

74.    I understand the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.  I believe that, under the circumstances, a waiver of the United States Trustee's requirement that the Debtors' bank accounts be closed and that new post-petition bank accounts be opened is warranted.  If enforced in the Cases, I believe that such requirements would cause significant and unnecessary disruption in the Debtors' business, thereby impairing their efforts to operate efficiently and pursue opportunities to maximize the value of their estates.

75.    I also understand that the Complex Chapter 11 Guidelines require debtors engaged in drilling, exploration, development, or operation of oil, gas, or mineral properties to

---

[5] In October 2015, the Debtors paid approximately $1,000,000 from the New Orleans Royalty Account for royalty obligations.

[6] In October 2015, the Debtors paid approximately $1,300,000 from the Houston Royalty Account for royalty obligations.

[7] In October 2015, the Debtors paid approximately $7,000 from the Resources Concentration, Operations & Royalty Account for royalty obligations.  The Debtors have not made any recent material payments from the Resources Land Account for land obligations.

comply with additional operating guidelines, such as maintaining a segregated account for funds received post-petition that are attributable to overriding royalties, working interest owners, and third parties.  Requiring the Debtors to comply with these requirements at this early and critical stage of the Cases would be expensive, impose needless administrative burdens on the Debtors, and would cause undue disruption to the Debtors' operations.  Any such disruption would affect the Debtors' ability to maximize estate values for the benefit of creditors and other parties in interest.  Such a disruption would be wholly unnecessary insofar as the continued use of the Debtors' bank accounts and Cash Management System provides a safe, efficient, and established means for the Debtors to maintain and manage their cash.

76.     Furthermore, funds attributable to overriding royalties, working interest owners, and third parties are proposed to be paid by the Debtors post-petition in the ordinary course of business pursuant to the Royalty Motion (defined below).  Amounts that are due and owing to certain holders of overriding royalties, working interest owners, and third parties but are otherwise unpayable will be maintained by the Debtors in a segregated account.  Accordingly, under the circumstances, I do not believe that requiring the Debtors to maintain segregated accounts for funds received post-petition that are attributable to overriding royalties, working interest owners, and third parties is warranted.

77.     Business Forms.  Prior to commencing the Cases, in the ordinary course of business, the Debtors used numerous business forms, including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks.  While the Debtors issue computer-generated checks from most of their bank accounts that can be modified electronically, at no additional cost to the Debtors' estates, to include the "debtor in possession" language and the case number assigned to the Cases, the Debtors utilize traditional checks and business forms for their Land

Accounts. The Debtors have an inventory of check stock and business forms for the Land Accounts that would go to waste if new checks were to be ordered and used. I believe that requiring the Debtors to change their business forms and checks with respect to the Land Accounts would be expensive, burdensome, and highly disruptive to the Debtors' business operations.

78.     Intercompany Transfers. The Debtors make a variety of routine Intercompany Transfers of funds in the ordinary course of business. The Intercompany Transfers (which are tracked by the Cash Management System) maintain operational efficiency and ensure the Debtors can, among other things, timely satisfy their accounts payable, royalty, land, and payroll obligations. Accordingly, I believe the Debtors should be authorized to continue engaging in the Intercompany Transfers post-petition in the ordinary course of business.

79.     Bank Fees. In the ordinary course of business, the Debtors' banks debit the Debtors' bank accounts for a number of fees and expenses related to the cost of administering such bank accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "Bank Fees"). The Bank Fees are either debited directly from the Debtors' bank accounts or are paid in connection with wire transfers. The Bank Fees are a normal cost of doing business and, without authority to pay such Bank Fees, the Cash Management System would be significantly impaired. Accordingly, I believe the Debtors should be authorized to continue paying the Bank Fees in the ordinary course of business.

80.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

      ii.     ***Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Granting Adequate Protection*** (the "<u>Cash Collateral Motion</u>")

81.    The Debtors have an immediate need for use of Cash Collateral in order to, among other things, preserve and maintain the value of their assets and businesses and maximize the return to all creditors so that they may execute a sale process and receive the highest possible value therein.  Further, an immediate and critical need exists for the Debtors to use Cash Collateral, consistent with the Budget, for working capital purposes, general corporate purposes, and the satisfaction of costs and expenses of administering the Cases.  The Debtors are without sufficient funds, other than Cash Collateral, to operate for 15 or more days until the Final Hearing can be held.  The Debtors are unable to obtain adequate unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.

82.    The Debtors are actively pursuing a sale process to sell their assets for repaying their indebtedness and maximizing the recovery to all creditors.  Absent the ability to use Cash Collateral, the Debtors will be forced to shut down all of their operations abruptly, which I believe will negatively impact the value of the Debtors' assets and eliminate any prospect for a distribution to certain creditors.   Access to Cash Collateral on an interim basis is critical and necessary to avoid immediate and irreparable harm to the value of their assets.  In order to maintain normal operations and to prevent immediate and irreparable harm, the Debtors should be authorized to use Cash Collateral on an interim basis pending a Final Hearing.

83.    I believe the Prepetition Secured Parties will be adequately protected because the Debtors will grant the Prepetition Secured Parties valid and perfected Adequate Protection Liens. Such Adequate Protection Liens include replacement liens on collateral that was not encumbered on the Petition Date.  The Debtors will also: (a) grant the Prepetition Secured Parties allowed

administrative Adequate Protection Claims; (b) pay as adequate protection (i) the reasonable professional fees, expenses, and disbursements incurred by the First Lien Agent and/or the First Lien Lenders under the First Lien Credit Agreement arising prior and subsequent to the Petition Date and (ii) all accrued and unpaid prepetition or post-petition interest, fees, and costs due and payable under the First Lien Credit Agreement; and (c) provide the Prepetition Secured Parties with ample reporting information regarding, among other things, prospective asset sales, business plans, updated cash flow forecasts, and budgets, which will enable the Prepetition Secured Parties to monitor their interests in the Prepetition Collateral and Cash Collateral. Accordingly, I believe the Debtors should be authorized to use Cash Collateral in accordance with the terms in the Interim Order.

84.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Employee Motion.

> **iii.    *Emergency Motion (a) Authorizing Debtors to (i) Pay Pre-Petition Wages and Salaries to Employees and Independent Contractors (ii) Pay Pre-Petition Benefits and to Continue Benefit Programs in the Ordinary Course and (b) Directing Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Obligations* (the "<u>Employee Motion</u>")**

85.     <u>Wages and Salaries</u>.  As of the Petition Date, the Debtors employed thirty-six full-time employees, each of whom are salaried and are paid on a semi-monthly basis.  As of the Petition Date, the aggregate semi-monthly payroll for the Debtors' employees is approximately $348,500.

86.     The Debtors utilize from time to time eleven independent contractors that provide crucial and highly specialized geological, engineering, accounting, and related services, all of which the Debtors depend upon for the continued operation of their businesses.  The hourly rates

for such independent contractors range primarily from $25 to $200 per hour, and the aggregate monthly expenditure for such independent contractors is approximately $200,000.

87.    <u>Payroll Processing</u>.  The Debtors use ADP, LLC ("<u>ADP</u>") to process their payroll and payroll tax obligations.  Each pay period, the Debtors transfer the appropriate amounts to their respective payroll accounts in advance of the employees' scheduled pay date, and ADP withdraws the funds to remit payment to the employees on the scheduled pay date.  The independent contractors are paid on a monthly and bi-monthly basis through the Debtors' accounting system upon submission of their invoices and approval by the appropriate manager.

88.    As compensation for its payroll processing and related services, ADP submits an invoice to the Debtors approximately two weeks after each payroll period for charges incurred, and approximately two weeks thereafter (*i.e.*, the end of the month following the month for which payroll processing services were rendered), ADP automatically debits such charges from the Debtors' payroll bank accounts.

89.    The Debtors fund their respective payrolls approximately five days before each payroll pay date.  The employees' next pay date for which funds are required will be on or around November 15, 2015.

90.    <u>Benefit Plans</u>.[8]  In the ordinary course of business, the Debtors provide employees with certain benefits, including: (a) medical insurance; (b) dental insurance; (c) vision insurance; (d) life and accidental death and dismemberment insurance; (e) long-term disability benefits; (f) workers' compensation; (g) a cafeteria plan (the "<u>Cafeteria Plan</u>") in which employees can elect to participate in flexible spending accounts or purchase Voluntary Products;  (h) a 401(k)

---

[8] Because most plan providers are paid in advance, and are currently paid through the Petition Date, the Debtors estimate that they have no significant pre-petition liabilities on account of unpaid premiums or expenses associated with the Benefit Plans.

retirement savings plan; (i) PTO benefits; and (j) in certain circumstances, severance pay upon termination.  The Benefit Plans that the Debtors seek to continue in the ordinary course, as more fully described in the Employee Motion, are as follows:[9]

| Benefit Plan[10] | Provider(s) |
|---|---|
| Medical and Rx Insurance | Anthem |
| Dental Insurance | Guardian |
| Vision Insurance | Guardian |
| The Cafeteria Plan (Flexible Spending Accounts and Voluntary Products) | WageWorks and AFLAC |
| Life Insurance | Guardian |
| Accident Death and Dismemberment Insurance | Guardian |
| Long-Term Disability | Guardian |
| 401(k) Retirement Savings | CMC Interactive/Charles Schwab |
| Workers' Compensation | Great American Insurance |

91.     *Medical, Dental, and Vision Coverage*.   The Debtors offer medical and prescription drug insurance (the "Health Insurance Plan") to their employees through Anthem Insurance Companies, Inc. ("Anthem").

92.     The Health Insurance Plan is fully insured and administered by Anthem. Anthem bills the Debtors monthly for the insurance premiums.  The Debtors pay all of the premiums associated with the Health Insurance Plan, including the premiums for spouses and

---

[9] PTO benefits and Severance Payments are discussed below.

[10] All of the Debtors' employees are participants in the Benefit Plans sponsored by RAAM.

eligible dependents.[11]  The premiums are calculated at the beginning of each year by Anthem's underwriters.  Employees are eligible for the Health Insurance Plan on the first day of employment.  The annual cost of the Health Insurance Plan to the Debtors is approximately $1,100,000.   I do not believe that any significant pre-petition amounts are owed on account of the Health Insurance Plan.

93.     The Debtors also offer a dental plan (the "Dental Plan") that is fully insured and administered by The Guardian Life Insurance Company of America ("Guardian").  The Debtors pay 100% of the premiums for each employee, including the premiums for spouses and eligible dependents.  The annual cost of the Dental Plan to the Debtors is approximately $48,500.  I do not believe that any significant pre-petition amounts are owed on account of the Dental Plan.

94.     The Debtors offer a vision plan (the "Vision Plan") that is fully insured and administered by Guardian.  The annual cost of the Vision Plan to the Debtors is approximately $8,500.  I do not believe that any significant pre-petition amounts are owed on account of the Vision Plan.

95.     *The Cafeteria Plan*.   Under the Cafeteria Plan, the Debtors' offer flexible spending accounts that are administered by WageWorks, Inc. ("WageWorks").   Flexible spending accounts provide employees with the opportunity to pay for their share of unreimbursed qualified medical and dependent care expenses with pre-tax dollars.  Under the flexible spending accounts offered by the Debtors, the Debtors withhold 100% of each participating employee's monthly contribution to their flexible spending accounts from each employee's paycheck.  When an employee submits a claim for reimbursement, WageWorks processes the claim and pulls from the Debtors' payroll accounts the funds needed to reimburse

---

[11] Approximately ten of the Debtors' former employees are COBRA participants.  Such employees pay the full cost of the COBRA benefits (including the applicable administration fees).

the employee—up to the total amount elected by the employee—to his or her flex spending account for the taxable year, and WageWorks transfers such funds to the employee's direct deposit account.   Like ADP, WageWorks debits its monthly service fee directly from the Debtors' payroll accounts.

96.     The Debtors also offer employees (via the Cafeteria Plan) the opportunity to purchase with pre-tax dollars the Voluntary Products offered through AFLAC.   Each payroll period, the Debtors withhold the employee's monthly cost of the Voluntary Products which are then paid, on a monthly basis, to AFLAC.   I do not believe that any significant pre-petition amounts are due to WageWorks or AFLAC on account of the flexible spending accounts and the Voluntary Products.

97.     *Life and Accidental Death and Dismemberment Coverage*.   Under the Debtors' life and accidental death and dismemberment insurance plan, which is fully insured and administered by Guardian, the Debtors pay all premiums attributable to their employees' life insurance, for a maximum coverage of $50,000.[12]   The annual cost of the life and accidental death and dismemberment insurance to the Debtors is approximately $6,200.   I do not believe that any significant pre-petition amounts are due to Guardian on account of the life and accidental death and dismemberment coverage.

98.     *Long-Term Disability Benefits*.   The Debtors also pay all premiums associated with long-term disability benefits, which are insured and administered by Guardian.   The annual cost of the long-term disability benefits to the Debtors is approximately $20,500.   I do not believe that any significant pre-petition amounts are due to Guardian on account of the long-term disability benefits.

---

[12] The maximum coverage for spouses and children of employees is $5,000 and $2,500, respectively.

99.    *Employee Assistance Program.*  Under the employee assistance program offered through ADP, the Debtors' employees and their eligible family members receive professional, confidential counseling and personal support on a variety of work and life issues including, *inter alia*, legal questions, financial issues, parenting and family concerns, and managing stress, depression, and loss.  I do not believe that any significant pre-petition amounts are due to ADP.

100.    *The 401(k) Plan.*  The Debtors maintain a 401(k) plan (the "<u>401(k) Plan</u>"), administered by CMC Interactive, LLC ("<u>CMC Interactive</u>") via Charles Schwab Corporation ("<u>Charles Schwab</u>"), through which participating employees may defer a portion of their salaries to help build retirement savings.  The Debtors' employees are eligible to participate in the 401(k) Plan on the first day of employment, subject to the terms and conditions of the 401(k) Plan.  The Debtors match employee contributions dollar for dollar, up to eight percent of each employee's eligible compensation under the 401(k) Plan.  Employees are always 100% vested in their employee deferrals to the 401(k) Plan.  There is a three-year graded vesting schedule applicable to the company-matching contributions to the 401(k) Plan.

101.    Contributions to the 401(k) Plan are withdrawn from the Debtors' respective payroll accounts by Charles Schwab each payroll period, with the next payment being due no later than seven business days after the Petition Date.  I believe the Debtors should be authorized to remit all necessary amounts deducted from employee paychecks on account of the 401(k) Plan.

102.    *Workers' Compensation.*  Under the laws of various states in which the Debtors have operations, the Debtors must maintain workers' compensation insurance.  The Debtors maintain workers' compensation insurance under policies administered by the Great American Insurance Group through The American Equity Underwriters, Inc.  The Debtors pay an annual

premium of approximately $28,853 for such coverage.  The Debtors pay all annual premiums in advance, as required by law.

103.    I am not aware of any outstanding pre-petition workers' compensation claims and I do not believe that any significant pre-petition amounts are owed on account of the workers' compensation coverage.  Because payment of the workers' compensation claims is essential to the continued operation of the Debtors' businesses under the laws of the states in which they operate, the Debtors should be authorized to pay any and all pre-petition workers compensation claims and to continue to fund the workers' compensation insurance policies in the ordinary course of business.

104.    *Miscellaneous Benefits*.  RAAM pays Royal Parking LLC d/b/a Go Park $1,400 per month for employee parking at the Debtors' New Orleans office.  RAAM also (a) subsidizes a gym membership—$1,000 per quarter paid to Premier Fitness—for employees at the New Orleans office; (b) pays a portion of the service charges for employees' personal digital assistants and cellular phones, as allowed under RAAM's business expense policy; and (c) offers maternity leave to all of the Debtors' employees.

105.    PTO Structure and Severance Payments.  As it applies to the New Orleans office, the Debtors offer fifteen PTO days[13] to their employees[14] and provide employees with a minimum of eight holidays[15] per year.[16]  PTO must be taken in the calendar year it was earned.[17]

---

[13] PTO days are to be used for vacation, sick, or personal time needs.

[14] PTO days for newly hired employees are calculated on a pro rata basis for the year in which they are hired.

[15] Normally observed holidays include January 1, Mardi Gras (for the New Orleans office only), Memorial Day, July 4, Labor Day, Thanksgiving, the day after Thanksgiving, Christmas Day, and a floating holiday (for the Lexington and Houston offices only).

[16] The Debtors also grant employees called into military service an unpaid leave of absence and re-employment rights as provided by federal law.

[17] Employees are not allowed to roll over unused PTO days from prior years.

Unused PTO cannot be carried over to the following year.  The Debtors do not allow employees to "cash out" unused PTO days at the end of the calendar year; however, in the ordinary course of business, employees are paid for their unused accrued PTO—up to fifteen days—upon the termination of their employment.

106.   In certain circumstances, the Debtors pay employees a two-week severance payment ("Severance Payment") upon the termination of their employment.  The Severance Payment is equal to one half of the employee's then-existing base monthly salary.

107.   Reimbursable Business Expenses.[18]   The Debtors have provided American Express cards to approximately ten employees to which such employees charge business-related expenses.  The American Express cards help to streamline the reimbursement process and they significantly decrease the amount and number of reimbursements sought by the Debtors' employees.  As such, the Debtors can write one check to cover several different reimbursable expenses, rather than having to handle requests for reimbursement on an individual basis.  Although the charges may fluctuate from month to month, the Debtors expend approximately $10,000 to $20,000 per month to pay off the charges made to American Express cards.  The expenses incurred by the Debtors' employees through use of the American Express cards and other means are ordinary course business expenses that employees incur in performing their job functions and conducting the Debtors' operations.

108.   The employees incur the reimbursable expenses on the Debtors' behalf in connection with their employment and in reliance upon the understanding that such expenses will be reimbursed.  I believe that the failure to reimburse the employees for such business expenses would negatively impact employee morale and may cause a financial hardship for

---

[18] The Debtors have instituted certain written policies and procedures pursuant to which they reimburse employees for business-related expenses.

employees with outstanding, pre-petition, reimbursable expenses.  Accordingly, I believe the reimbursement of the employees' business expenses is essential for the continued operation of the Debtors' businesses that the Debtors be authorized to continue paying the American Express bills and reimbursing employees for any business-related expenses that are not paid directly with the American Express cards.

109.    Payroll Taxes.    The Debtors are required by law to withhold from each employee's wages all applicable federal, state, and local income taxes, social security taxes, and Medicare taxes (the "Payroll Taxes").   In addition, the Debtors are required to: (a) pay the employer portion of social security and Medicare taxes with respect to each employee's wages; (b) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (c) remit these payroll taxes to various taxing authorities.

110.    I am aware that the Payroll Taxes might be considered "trust fund" taxes, and that the Debtors' officers and directors might be held personally liable for the payment of such funds. Any suits or other actions instituted against the Debtors' officers and directors would prove extremely distracting for the Debtors, the named officers and directors whose immediate and full-time attention to the Cases is required, and this Court, which may be asked to entertain various motions seeking injunctions relating to potential state court actions.  As such, I believe that it is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming and potentially damaging distractions by the timely payment of the Payroll Taxes.

111.    Plan Administrators and Other Service Providers.  Numerous plan administrators and other service providers, including ADP, assist the Debtors in the day-to-day administration of their Benefit Plans.  I do not believe that any significant pre-petition amounts are due to the plan administrators or other service providers.

112.     Administration of the Benefit Plans and related services is critical to the Debtors' operations.   Accordingly, I believe the Debtors should be authorized to continue to pay any undisputed and outstanding pre-petition fees of the plan administrators and other service providers, and continue to pay the fees and costs of the plan administrators and other service providers post-petition in the ordinary course of business.

113.     The Debtors' books and records indicate that: (a) other than amounts related to the period immediately prior to the Petition Date, the Debtors are current on all Obligations and (b) as of the Petition Date, only one independent contractor is owed in excess of the $12,475 statutory priority provided by Bankruptcy Code § 507(a) as a result of pre-petition wages.   I do not believe any employees are owed in excess $12,475 as of the Petition Date.[19]

114.     I believe that payment of the Obligations and continuation of the Employee Benefits is necessary for the Debtors' to preserve value during the Cases.   Moreover, I believe that it is critical for employee productivity, stability, and morale that all of the Employee Benefits—and payments of the Obligations—remain current and are continued post-petition.   If the Obligations are not paid in the ordinary course of business, or if any of the Employee Benefits are discontinued, employee morale will deteriorate, which, in turn, will adversely impact the Debtors' ability operate in chapter 11.   Further, if the Employee Benefits are not paid in the ordinary course of business, the employees would suffer personal hardship and would not receive needed medical and related services.   This will hurt the employees, destabilize the Debtors, and materially impact the Debtors' businesses.

---

[19] During the period between entry of the interim and final orders on the Employee Motion, the Debtors anticipate paying the following estimated amounts on account of the above-referenced Obligations: (a) $300,000 on account of the Employee Claims; (b) $200,000 on account of the Independent Contractor Claims; (c) $145,000 on account of the Employee Benefits; and (d) $6,700 to ADP for payroll processing and related services.

115.     Any loss of employees and independent contractors would disrupt the Debtors' operations and would deplete the value of their estates.  I am aware that the competition in the onshore and offshore oil and natural gas industry, particularly for skilled employees and independent contractors, makes the Debtors' employees and independent contractors particularly mobile.  I believe that the Debtors should be authorized to pay all pre-petition Obligations and to maintain the Employee Benefits and continue paying the Obligations post-petition in the ordinary course of business.  Further, I believe that (a) the Debtors' banks and other financial institutions should be directed to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors relating to the Obligations, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date, and (b) the Debtors should be authorized to issue post-petition checks, or to effect post-petition funds transfer requests in replacement of any checks or funds transfer requests with respect to any pre-petition Obligations dishonored or denied as a consequence of the commencement of the Cases.

116.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Employee Motion.

       **iv.**    ***Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments* (the "<u>Utility Motion</u>")**

117.     <u>Utility Services</u>.  The Debtors use electric, water, telephone and communications, internet, sewer, gas, and similar services from numerous Utilities that are necessary for the continued operation of the Debtors' day-to-day affairs.  Uninterrupted utility service is critical to the Debtors' business operations, and the loss of utility service at any of the Debtors' offices or

onshore or offshore wells would cause the Debtors to cease or limit their operations, to the detriment of all parties in interest.

118.    I believe that the proposed Adequate Assurance Deposits listed on **Exhibit A** to the Utility Motion, which are calculated based on two-weeks' worth of Utility service, are sufficient adequate assurance of the Debtors' future payments to the Utility providers.[20]  Further, I believe that to the extent not already returned or applied, any Adequate Assurance Deposit requested by and provided to any Utility should be returned to the Debtors at the conclusion of the Cases.

119.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

      **v.**    ***Emergency Motion for Authority to Pay or Honor Pre-Petition Obligations to Certain Critical Vendors* (the "<u>Critical Vendor Motion</u>")**

120.    In the Critical Vendor Motion, the Debtors request authority to pay, in the reasonable exercise of their business judgment, amounts owed to certain vendors that are essential to the Debtors' business operations (as listed on **Exhibit A** to the Critical Vendor Motion, the "<u>Critical Vendors</u>").

121.    Each of the Critical Vendors provides critical and necessary goods and services to the Debtors, including, *inter alia*, salt water removal services critical to the Debtors' drilling operations, waste disposal services, oil field services, drilling supplies and materials, and information technology and other computer-related services (collectively, the "<u>Critical Goods and Services</u>").  For purposes of the Critical Vendor Motion, a vendor was considered critical

---

[20] As set forth on **Exhibit A** to the Utility Motion, the proposed Adequate Assurance Deposits total $16,136.78.

only if the goods and services provided by such vendor cannot be easily and efficiently replaced, which is often the case in remote locations where the pool of available vendors is limited or when a highly-skilled work force is involved, or in the Gulf of Mexico where alternatives are typically limited and interruption of services or supplies is especially critical.

122.    I believe the list of Critical Vendors reflects only those vendors whose goods and services (a) are of great necessity on a go-forward basis and (b) cannot be easily and efficiently replaced.  In each instance, failure to pay the Critical Vendors for the Critical Goods and Services would likely result in a severe disruption or cessation of certain of the Debtors' operations, and, thus, would undermine various ongoing projects and the revenues derived therefrom.  Further, I am aware that the failure to pay many of the Critical Vendor claims would give rise to reclamation demands, mechanics' and materialmen's liens, or administrative expense claims under Bankruptcy Code § 503(b)(9), which I understand would likely be entitled to payment priority.

123.    The Critical Vendors are essential to the continuation of Debtors' businesses.  Indeed, without the provision of the Critical Goods and Services, the Debtors' ability to generate revenue in chapter 11 would be materially diminished.  This potential loss of economic value to the Debtors' estates is highly disproportionate to the limited pre-petition amounts to be paid on account of the Critical Goods and Services.  Moreover, it would be very difficult, if not impossible, for the Debtors to select alternative vendors, and doing so would cost the Debtors valuable time trying to retain new vendors to provide the Critical Goods and Services to their operations.  To the extent the Debtors would be required to seek new vendors, the Debtors would be unable to operate for some time, causing a material decline in revenue and cash flow.  The time and expense inherent in obtaining alternative vendors would, of course, be in addition to the

increased costs and fees likely associated with doing business with alternate vendors on a post-petition basis.

124.     Even if the Debtors were able to convince the Critical Vendors to continue to supply the Critical Goods and Services to the Debtors absent payment of their pre-petition claims, I believe the Critical Vendors will likely agree to do so only on trade terms much less favorable than customary.  If the Debtors can benefit from maintaining lower costs of the Critical Goods and Services purchased during the post-petition period and avoid the severe disruption that might be caused by a cessation of the Critical Goods and Services, I believe that the Debtors should have the authority to pay selected Critical Vendors some or all of their pre-petition claims.

125.     For the foregoing reasons, I believe that it is in the best interest of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Critical Vendor Motion.

> **vi.    *Emergency Motion for Order Authorizing Debtors to Continue Insurance Policies and Bonding Program* (the "<u>Insurance and Bonding Motion</u>")**

126.     <u>Insurance Broker and Agent</u>.  The Debtors employ Upstream as their insurance broker and agent.  The Debtors pay Upstream either a commission or a fee[21] to find and sell the Insurance Policies to the Debtors.  Upstream also advises the Debtors on the appropriate policies for the Debtors' businesses.  I do not believe any significant pre-petition amounts are due to Upstream.

127.     <u>Insurance Policies</u>.  In the ordinary course of business, the Debtors maintain certain Insurance Policies covering, *inter alia*, physical damage to oil and gas infrastructure,

---

[21] The offshore and onshore energy packages reflected on **<u>Exhibit A</u>** are fee-based; the remaining insurance packages are commission-based.

operator's extra expense, general liability, workers' compensation, United States Longshore and Harbor workers' compensation, aviation, maritime employer's liability, inland marine and related property, boiler and machinery, oil pollution liability, director and officer, and flood. The Insurance Policies are essential to the Debtors' ongoing operations. A summary of the Insurance Policies is attached to the Insurance and Bonding Motion as **Exhibit A**.

128.    The success of the Debtors' efforts to operate in chapter 11 will depend on the maintenance of the Insurance Policies on an uninterrupted basis. I believe that any unsecured creditors' committee appointed in the Cases would expect and demand that the Debtors maintain, at a minimum, certain property and liability Insurance Policies. Furthermore, I am aware that the Debtors have a fiduciary obligation and a legal duty to maintain the Insurance Policies pursuant to the Operating Guidelines and Reporting Requirements of the Office of the United States Trustee for Region 7. The Debtors' failure to pay the Insurance Claims, as and when they become due, could affect their ability to renew the Insurance Policies, which could have a material adverse effect on the Debtors' operations. If the Insurance Policies are allowed to lapse or are terminated, or if the Debtors default under the Insurance Policies based on their non-payment of Insurance Claims, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others. This exposure would negatively impact the Debtors' ability to operate effectively and efficiently without disruption in chapter 11. Additionally, to ensure the retention of qualified and dedicated senior management, the Debtors must continue the directors' and officers' liability policies. Accordingly, I believe that the Debtors should be authorized to maintain the Insurance Policies and pay the Insurance Claims as well as to revise, extend, supplement, or change insurance coverage, as necessary, in the ordinary course of business.

129.   <u>Bonding Program</u>.  The Bonding Program is required to, *inter alia*, permit the Debtors to continue operating under various leasing agreements with BOEM, and maintaining the Bonding Program throughout the Cases is necessary to ensure the Debtors are able to operate under BOEM's authority upon their emergence from chapter 11.  A summary of the Debtors' current Bonding Obligations is attached to the Insurance and Bonding Motion as **<u>Exhibit B</u>**.[22]

130.   *Escrow Account*.  Historically, the Debtors have paid $750,000 each month into the Escrow Account for the benefit of ACE to secure the Debtors' obligations to ACE as part of the Bonding Program.  As set forth in the Insurance and Bonding Motion, the Debtors are requesting authority, in their discretion, to contribute post-petition funds into the Escrow Account solely in accordance with any Court approved budget and any order authorizing use of the Debtors' cash collateral.

131.   *Gulf of Mexico Leases*.  The Debtors, primarily through Century New Orleans, are lessors under various oil and gas leases issued by, among other lessors, the Department of the Interior on behalf of the United States Government.  Certain of these oil and gas leases (the "<u>Gulf of Mexico Leases</u>") are for exploration and production activities on the outer-continental shelf in the Gulf of Mexico.  Through the operation of their oil and gas interests, the Debtors explore for, and produce, hydrocarbons.

132.   I understand that the Debtors do not meet BOEM's requirements for exempt status and are unable to obtain a third party guaranty of the Financial Responsibility Obligations by an otherwise exempt entity.  Further, due to liquidity constraints, the Debtors have been unable to post cash or treasury securities as a means to meet their Financial Responsibility Obligations.  As a result, I believe the only feasible option that enables the Debtors to meet the

---

[22] The Debtors anticipate paying approximately $80,000 for bond renewals during the period between the entry of interim and final orders on the Insurance and Bonding Motion.

Financial Responsibility Obligations without necessitating a significant outlay of cash is by maintaining the Bonding Program. I understand that failure to meet the Financial Responsibility Obligations (and remaining in compliance therewith) could result in BOEM (a) suspending the Debtors' operations under the Gulf of Mexico Leases, thereby prohibiting the Debtors from producing oil and gas therefrom, (b) taking legal action to cancel the Gulf of Mexico Leases, and (c) assessing other penalties against the Debtors.

133.    The Gulf of Mexico Leases comprise a significant part of the Debtors' assets[23] and are a key component to Debtors' ability to operate in chapter 11 and maximize value for the benefit of all parties in interest. The success of the Debtors' efforts to operate effectively in chapter 11 will likewise depend on the maintenance of the Bonding Program on an uninterrupted basis.

134.    I am aware that the Debtors' failure to pay the Bonding Obligations, as and when they become due, could result in a default under the applicable bonding agreements. If the Debtors default under the bonding agreements, the surety bond issuers may assert that they have the right to terminate the surety bonds. If the issuers terminate the surety bonds, the Debtors would no longer be compliant with the Financial Responsibility Obligations, and thus, the Debtors would not be legally permitted to continue their drilling operations under the Gulf of Mexico Leases. The Debtors would need to post different collateral to BOEM to the extent needed to continue operating. In my experience, I believe it is unlikely that any other entity will provide such bonds to the Debtors; thus, the Debtors would have to provide cash collateral or other security to BOEM. The Debtors, however, lack the cash to do so.

---

[23] Specifically, the Gulf of Mexico Leases comprise 6,327 MMBoe at June 30, 2015 (or 64% of total reserves). The Debtors have also purchased surety bonds on onshore oil and gas leases and leases in Louisiana state waters.

135.    Accordingly, I believe that no feasible alternative to maintaining the Bonding Program exists.  Therefore, if the Bonding Program is not maintained on an uninterrupted basis, the Debtors' operations could ultimately be shut down, the Debtors' ability to operate in chapter 11 would be significantly impaired, and the Debtors ability to resume its operations post-bankruptcy would be severely hampered.  Further, I believe that any unsecured creditors' committee appointed in the Cases would expect, and demand, that the Debtors continue to pay their Bonding Obligations and maintain the Bonding Program to allow the Debtors to continue to operate under the leasing arrangements with BOEM.  As a result, I believe that the Debtors should be authorized to maintain the Bonding Program and pay the Bonding Obligations as provided for in the Insurance and Bonding Motion  as well as to purchase new, supplemental, or replacement surety bonds, as necessary, in the ordinary course of business.

136.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Insurance and Bonding Motion.

      **vii.**    *Emergency Motion for Authority to Pay Royalty and Working Interest Obligations, Lease Operating Expenses, JIBs, and Trade, and Potential Holders of Statutory Liens* **(the "Royalty Motion")**

137.    Oil and Gas Leases and Operations.  The Debtors' operations are focused on the exploration, development, and production of oil and gas.  The Debtors own an interest in approximately 947 oil, gas, and mineral leases, and are parties to numerous JOAs governing operations of the wells.  All of the Debtors' leasehold interests are subject to or burdened by one or more of: royalty interests, overriding royalty interests, non-participating royalty interests, and third party working and non-working interests.

138.    The Debtors, as operators, among other things: (a) often market and sell hydrocarbons produced from the operated wells on behalf of the holders of (i) non-operating working interest owners and (ii) Mineral and Other Interests; (b) distribute the proceeds from the sale of such production to such holders; and (c) pay the Lease Expenses and other costs associated with the operation of the oil and gas wells.

139.    <u>The Mineral and Other Interests</u>.  In connection with their oil and gas assets, the Debtors are obligated, pursuant to their oil and gas leases and other agreements, to remit to the lessors of the oil and gas leases and potentially other parties their share of revenue from the producing wells located on the respective leases (the "<u>Royalties</u>").  In addition, overriding royalties ("<u>ORRI</u>")[24] must be remitted to the owners of those interests, and the holders of non-executive mineral interests (the "<u>Non-Executive Interests</u>") as well as the holders of non-participating royalty interests (the "<u>NPRI</u>" and, together with the Royalties, ORRI, and Non-Executive Interests, the "<u>Mineral and Other Interests</u>") must receive the proceeds due to them pursuant to the applicable agreement.[25]  Failure to forward the aforementioned required amounts would have a material adverse effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of oil and gas leases, penalties and interest, turnover actions, conversion claims, significant lien claims, constructive trust claims, litigation, and, in some instances, removal as operator.[26]  Accordingly, I believe the Debtors should be authorized to (a) pay outstanding and undisputed pre-petition amounts owed on

---

[24] For purposes of the Royalty Motion, ORRIs include, without limitation, overriding royalties that have been (a) granted to the Debtors' employees pursuant to the APORRI Plan disclosed in the Employee Motion, and (b) recorded by such employees prior to the Petition Date.

[25] The Debtors are also obligated to remit a portion of the revenue from producing wells that remains after deducting the amounts attributable to the foregoing interests to the owners of the working interests in those wells.

[26] In certain circumstances, the Debtors have received payment for the share of proceeds due to the holders of Mineral and Other Interests; however, due to timing, such proceeds have not been remitted to such holders of Mineral and Other Interests prior to the Petition Date.

account of Mineral and Other Interests as such have been paid by the Debtors in the ordinary course of business; and (b) continue to pay post-petition amounts attributable to the Mineral and Other Interests in the ordinary course of business.

140.    The Debtors' books and records indicate that as of the Petition Date, the Debtors estimate that they owe approximately $3,900,000[27]  (a) to the holders of the Mineral and Other Interests and (b) on account of the Marketing Obligations.[28]   Of this amount, approximately $600,000 is attributable to the Suspended Funds.[29]

141.    <u>Lease Operating Expenses</u>.  The Debtors are operators for a number of the oil and gas wells in which the Debtors hold an interest, many under JOAs with other parties.   In connection with the daily operation of those wells, the Debtors incur numerous lease operating expenses ("<u>LOEs</u>").   Many of the invoices for LOEs will cover both pre-petition and post-petition expenses.  Given the number of such invoices, the Debtors' limited accounting staff, and the Debtors' need to focus on and prioritize more imperative issues during the early stages of the Cases, separating the pre-petition portions from the post-petition portions of each individual invoice will be very difficult for the Debtors to timely accomplish.  Failure by the Debtors to satisfy their LOE obligations as they arise could have material adverse consequences on the Debtors and their operations, including, inter alia, being removed as operator and the assertion of significant secured claims (statutory and contractual) against property of the estates by holders of

---

[27] Under the Debtors' current revenue distribution system, the Debtors are unable to separate amounts attributable to Mineral and Other Interests and Marketing Obligations.

[28] The Debtors anticipate paying approximately $3,300,000 ($3,900,000 less the $600,000 in Suspended Funds) to the holders of the Mineral and Other Interests and on account of the Marketing Obligations during the period between the entry of the interim and final orders on the Royalty Motion.

[29] The Suspended Funds represent amounts that are due and owing to certain holders of Mineral and Other Interests but are otherwise unpayable for a variety of reasons, including, *inter alia*, incorrect contact information, ongoing disputes over ownership of the underlying interest, and failure to meet minimum payout requirements. To the extent that the issue preventing payment of Suspended Funds to a particular interest holder is resolved, the Debtors release the Suspended Funds in question.

LOE claims or other non-operating interests.  Accordingly, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition LOEs and continue to pay such LOEs post-petition in the ordinary course of business.[30]

142.   Delay Rentals.  Often the Debtors are also required to make rental payments during a term of a lease (the "Delay Rentals").  Payment of the Delay Rentals postpones the Debtors' obligation for initial exploration and development of each lease for the entire period for which they are paid.  Thus, if the Delay Rentals are paid on or before the anniversary date for each year during the primary term of each lease, each lease will be maintained in full force in effect and the Debtors will not be required to engage in exploration and development.  If the Delay Rentals are not paid and the Debtors do not engage in exploration and development, the lease will terminate.  Accordingly, failure to pay the Delay Rentals could similarly have a material adverse effect upon the Debtors and their operations, including, inter alia, the loss of the underlying lease.  Therefore, I believe the Debtors should be authorized to pay outstanding undisputed pre-petition Delay Rentals and continue to pay such Delay Rentals post-petition in the ordinary course of business.[31]

143.   JIBs.  Although the Debtors generally operate the wells in which they own an interest, there are certain instances in which the Debtors hold non-operating working interests in wells under various JOAs.  In such instances, the Debtors receive payment representing their share of production revenues.  The Debtors receive revenue receipts from the operators and directly from the purchasers, and then reimburse the operators for their share of the production costs through payment of joint-interest billings ("JIBs").  I am aware that rights to payment of

---

[30] The Debtors anticipate paying approximately $2,950,000 in LOEs during the period between the entry of interim and final orders on the Royalty Motion.

[31] The Debtors anticipate paying approximately $5,000 in Delay Rentals during the period between the entry of interim and final orders on the Royalty Motion.

JIBs are often secured under contractual lien rights or statutory lien rights in favor of the operator against the Debtors' interest in the well.  Accordingly, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition JIBs and continue to pay such JIBs post-petition in the ordinary course of business.[32]

144.  <u>Offers to Lease</u>.  In addition to the various expenses owed in connection with existing wells, the Debtors incur liabilities through their efforts to secure additional oil and gas leases and extend certain others.  The Debtors often solicit potential and current lessors by sending a letter expressing a desire to enter into (or extend) a lease arrangement and enclosing a proposed lease or lease amendment, as applicable.  To entice the potential and current lessors to execute and return the appropriate documentation, the Debtors may also include an Offer to Lease ("<u>OTL</u>").  An OTL is the mechanism by which cash and additional cash consideration is provided to the lessor if the lease (or lease amendment) and OTL are both signed and returned to the Debtors.  Once both executed documents are received, the Debtors send a check in the amount required under the OTL.  The Debtors' books and records indicate that, as of the Petition Date, the Debtors have approximately $500 in outstanding OTL obligations.  Given the minimal outstanding OTL liabilities and the potential benefits from acceptance of such OTLs, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition OTL obligations and continue to pay such OTL obligations post-petition in the ordinary course of business.[33]

145.  <u>Marketing Obligations</u>.  The Debtors are also obligated under various agreements to market the oil and gas production (the "<u>Marketed Production</u>") of certain owners of working interests (the "<u>Working Interests</u>") to potential purchasers and remit the amounts due to the

---

[32] It is my understanding, based on my review of the Debtors' books and records, that the Debtors' JOA and JIB obligations are immaterial.

[33] The Debtors anticipate paying approximately $500 in outstanding OTL liabilities during period between the entry of interim and final orders on the Royalty Motion.

appropriate parties (the "Marketing Obligations"). Specifically, following the sale of Marketed Production and the receipt of proceeds attributable thereto, the Debtors are obligated to remit the amount of those proceeds belonging to the owner of the Working Interest, net of all applicable Mineral and Other Interests, gathering costs, processing and transportation expenses, and production taxes. The Marketing Obligations also require that the Debtors process and forward to the appropriate parties, from funds otherwise belonging to third parties, the amounts due on account of the Mineral and Other Interests, gathering costs, processing and transportation expenses, and production taxes.

146.    Failure to forward all required amounts could have a material adverse effect upon the Debtors, including, without limitation, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the estate, litigation, and, in some instances, removal as operator.[34]   Accordingly, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition Marketing Obligations and continue to such Marketing Obligations post-petition in the ordinary course of business.

147.    Potential Lien Claimants.  As part of their exploration and production operations, the Debtors rely to a significant degree on a number of third parties, including vendors, contractors, and suppliers (collectively, the "Potential Lien Claimants"), who provide services, supplies, and materials necessary to ensure that the Debtors' operations continue in a timely manner. In the ordinary course of their business, the Debtors incur obligations to the Potential

---

[34] In certain circumstances, the Debtors have received payment for the share of proceeds due to the appropriate parties in connection with the Marketing Obligations; however, due to timing, such proceeds have not been remitted to such parties prior to the Petition Date. The Debtors do not anticipate having to pay any material amounts on account of the Marketing Obligations during the period between the entry of interim and final orders on the Royalty Motion.

Lien Claimants (the "Potential Lien Obligations"[35] and, together with the Mineral and Other Interests, the Lease Expenses, the Marketing Obligations, and the § 503(b)(9) Claims, the "Obligations")  and pay the Potential Lien Claimants for their services.[36]

148.   Although the Debtors generally make timely payments to the Potential Lien Claimants, as of the Petition Date, certain Potential Lien Claimants have not received payment for pre-petition goods and services or have failed to cash checks received prior to the Petition Date.  As a result, I understand that the Potential Lien Claimants may assert a right under Texas and Louisiana state laws to assert statutory or other liens that attach to the Debtors' interest in the oil and gas leases.[37]  Accordingly, in order to preserve the *status quo*, avoid the incurrence of unnecessary statutory liens, and eliminate the risk of pervasive litigation over the existence of statutory liens, lien priorities, and the amounts of claims of the various Interest Owners and the Potential Lien Claimants, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition obligations to the Potential Lien Claimants and continue to satisfy post-petition obligations to the Potential Lien Claimants in the ordinary course of business.

149.   Bankruptcy Code § 503(b)(9) Claims.  I am aware that certain parties may have potential administrative claims under Bankruptcy Code § 503(b)(9) ("§ 503(b)(9) Claims") based on the value of goods received by the Debtors within 20 days before the Petition Date.  Accordingly, in order to avoid the incurrence of unnecessary § 503(b)(9) Claims and to eliminate the risk of any litigation over the existence of such claims, I believe that it is in the best interests

---

[35] Potential Lien Obligations include those amounts that the Debtors believe, in good faith, are subject to Statutory Liens.

[36] The Debtors anticipate paying approximately $422,500 to the Potential Lien Claimants during the period between the entry of interim and final orders on the Royalty Motion.

[37] The Debtors also have assets located in California, New Mexico, and Oklahoma.  It is my understanding that these states have similar laws that protect the Potential Lien Claimants by granting them statutory liens to secure payment for their services.

of the Debtors, the Court, and all parties in interest that the Debtors be authorized to pay those parties who have provided goods to the Debtors within 20 days of the Petition Date.

150.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Royalty Motion.

> **viii.    *Motion to Establish Notification Procedures and Approve Restrictions of Certain Transfers of Interest in the Debtors' Estates* (the "Stock Trading Motion")**

151.    The Debtors have incurred and expect to continue to incur significant net operating losses ("NOLs").  The Debtors' books and records indicate that as of September 30, 2015, the Debtors have estimated NOLs of $112 million and $123 million for federal and state tax reporting purposes, respectively.  In addition, as of September 30, 2015, the Debtors have generated $4.6 million in minimum tax credits (the "AMT Credits" and, together with the NOLs, the "Tax Attributes") for federal tax reporting purposes.[38]  I am aware that the Tax Attributes are very valuable assets because corporations are authorized under the IRC to (a) carry forward certain tax attributes to offset taxable income and tax liability, thereby enhancing the corporation's liquidity in the future and (b) carry forward AMT Credits indefinitely, thereby reducing future aggregate tax obligations.

152.    The Debtors' federal NOLs begin expiring in 2029, and the majority of the Debtors' state NOLs begin expiring after 2023.  The Debtors' Tax Attributes may be worth as

---

[38] I understand that Century New Orleans, Century Houston, and Century Resources are treated as disregarded entities of RAAM for U.S. federal income tax purposes.  As such, the Tax Attributes of Century New Orleans, Century Houston, and Century Resources are treated as the Tax Attributes of RAAM for federal income tax purposes.

much as $52 million in potential future tax savings.[39]  These potential future tax savings could provide a significant benefit to the Debtors' estates and parties in interest and should remain protected while the Debtors navigate efficiently through chapter 11.

153.    I understand that if the relief requested in the Stock Trading Motion is not granted, there is a risk that, as a result of pre-consummation trading and acquisitions of Stock in RAAM, the use of the Debtors' Tax Attributes may be permanently impaired.[40]  Accordingly, the Court should implement the Notification Procedures and restrictions set forth in the Stock Trading Motion to (a) protect the value of the Tax Attributes, which are valuable assets of the Debtors' estates, while providing appropriate latitude for trading of Stock below specified levels and (b) ensure the Debtors have the opportunity to avail themselves of the more lenient standards with respect to chapter 11 plan Ownership Changes.

154.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Stock Trading Motion.

ix.    ***Emergency Motion for Authority to Pay (a) Pre-Petition Use and Other Taxes and (b) Licensing and Permit Fees in the Ordinary Course*** (**the "Taxes Motion"**)

155.    In the ordinary course of business, the Debtors pay sales and use taxes (the "Sales and Use Taxes"), property taxes, including ad valorem taxes (the "Property Taxes"), federal, state, and local severance and production taxes (the "Production Taxes"), franchise and income

---

[39] I am advised that this projection is based upon (a) tax savings generated by the NOLs based on a U.S. federal corporate income tax rate of 35% and a blended state corporate income tax rate of 7% and (b) a dollar-for-dollar reduction in U.S. federal income taxes for the AMT Credit.

[40] I understand that RAAM has not experienced an Ownership Change within the applicable testing period under the IRC.

taxes (the "Franchise/Income Taxes"), and other taxes (together with the Sales and Use Taxes, Property Taxes, Production Taxes, and Franchise/Income Taxes, the "Taxes") to the respective taxing authorities (collectively, the "Taxing Authorities") when such Taxes become due.

156.   Sales and Use Taxes.   Certain Taxing Authorities require the Debtors to collect from their customers, or for the Debtors to pay as a customer, Sales and Use Taxes that are based on a percentage of sales prices.   In most cases, the Sales and Use Taxes are paid in arrears once collected.   It is difficult for the Debtors to estimate the amount of Sales and Use Taxes owed as of the Petition Date, as such taxes are taken into account in the hundreds of invoices either generated or paid by the Debtors.   As such, I believe the Debtors should be authorized to continue their ordinary business practices of invoicing and paying invoices that account for the applicable Sales and Use Taxes, whether such invoices are pre-petition or post-petition invoices.

157.   Property Taxes.   I understand that the Property Taxes are calculated on a statutorily mandated percentage of property value, that Property Taxes are due annually, and that the timing of payment of Property Taxes varies from jurisdiction to jurisdiction.   As of the Petition Date, the Debtors estimate that while significant Property Tax amounts have been assessed and paid prior to the Petition Date, there are Property Taxes that have not yet been assessed or may be disputed.   As a result, certain Property Taxes may be billed during the pendency of the Cases.   As such, in an abundance of caution, I believe the Debtors should be authorized to pay, in the normal course of the Debtors' operations, any Property Tax obligations if and when they become due and payable during the pendency of the Cases.

158.   Production Taxes.   Various Taxing Authorities also assess Production Taxes based on the Debtors' extraction of oil and gas, usually as a percentage of revenues.[41]

---

[41] I understand that Louisiana charges a fixed tax per mcf of gas produced.

Production Taxes are essentially akin to a sales tax in form and effect.   I am aware that each state in which the Debtors operate has different rules, guidelines, and procedures related to the assessment of the Production Taxes, and it is my understanding that each of such states assesses its taxes at a different rate ranging from .075 percent to .125 percent.[42]   Because the payment of Production Taxes is directly related to the Debtors' ability to continue the extraction and sale of oil and gas, payment of the Production Taxes is critical to the Debtors' continued operations. Accordingly, I believe the Debtors should be authorized to pay, in the normal course of the Debtors' operations, any Production Taxes if and when they become due and payable during the pendency of the Cases.

159.   <u>Franchise Taxes</u>.  The Debtors have Franchise Tax obligations they must pay to various state Taxing Authorities in jurisdictions where the Debtors operate or are authorized to do business.  Based on my review of the Debtors' books and records, I believe the Debtors are current on their Franchise Tax obligations.

160.   I understand that the Franchise Taxes are assessed annually and are necessary to remain in good standing in the respective jurisdictions.  Accordingly, I believe the Debtors the Debtors should be authorized to pay the Franchise Tax obligations if and when they become due and payable during the pendency of the Cases.

161.   <u>Other Taxes</u>. I am aware that, to the extent the Debtors have collected any Taxes from third parties (the "<u>Trust Fund Taxes</u>"), such amounts may be held in trust for the benefit of the Taxing Authorities.   I am also aware that in many states, officers and directors of the collecting entity may be held personally liable for the payment of Trust Fund Taxes to the Taxing Authorities.  Accordingly, as to accrued Taxes of the Debtors that are unpaid as of the

---

[42] The Debtors pay the Production Taxes for all wells except oil severance taxes for wells located in Texas, as Texas law requires oil purchasers to pay the oil severance taxes.

Petition Date, the Debtors' officers and directors may be subject to lawsuits during the pendency

of the Cases.  Such lawsuits would prove distracting for the Debtors and the named officers and

directors, whose immediate and full-time attention to the Debtors' operations is required.

162.    I believe that payment of the pre- and post-petition Taxes is critical to the

Debtors' continued, uninterrupted operations.  Non-payment of these Taxes may cause the

Taxing Authorities to take precipitous action, including, but not limited to, filing liens,

preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift

the automatic stay, and possibly seeking to impose personal` liability on the Debtors' officers

and directors for certain unpaid Taxes, all of which could disrupt the Debtors' day-to-day

operations and could potentially impose significant costs on the Debtors' estates.  The failure to

pay the Taxes could impair the Debtors' ability to effectively and efficiently operate in chapter

11.  Accordingly, I believe that the authority to pay the Taxing Authorities in accordance with

the Debtors' pre-petition business practices will enable the Debtors to continue to operate their

business in chapter 11 efficiently and without disruption.[43]   Further, I believe the Cap of

$2,750,000 is appropriate, as such amounts are necessary to pay estimated Production Taxes of

$350,000 estimated $2,400,000 in other Taxes.[44]

163.    For the foregoing reasons, I believe that it is in the best interests of the Debtors,

their estates and creditors, and all other parties in interest that the Court grant the relief requested

in the Taxes Motion.

---

[43] The Debtors anticipate paying approximately $350,000 in Production Taxes to the Taxing Authorities during the period between the entry of interim and final orders on the Taxes Motion.

[44] The Debtors pay the Production Taxes for all wells except oil severance taxes for wells located in Texas.

**DECLARATION OF JAMES R. LATIMER, III**
**IN SUPPORT OF FIRST DAY PLEADINGS**                                         Page **55** of **57**
US 3849251v.3

**III.     CONCLUSION**

164.    The Debtors' immediate objective is to continue to operate their businesses with as little interruption or disruption as possible to minimize any loss of value during the pendency of the Cases.  I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed:  October 26, 2015.

/s/  *James R. Latimer, III*_____
James R. Latimer, III